UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITES STATES OF AMERICA

       - against -                      Docket No.  S8-16 Cr. 403 (GRB)

ALEXI SAENZ,

                  Defendant.
------------------------------------------------------------x

**SENTENCING MEMORANDUM (Corrected)**
on behalf of ALEXI SAENZ

                  Natali Todd, Esq.
                  LAW OFFICES OF NATALI J.H. TODD, P.C.
                  26 COURT STREET, SUITE 413
                  BROOKLYN, NEW YORK 11242
                  (718) 797-3055
                  email: _natali_todd@yahoo.com_

                  FEDERAL COMMUNITY DEFENDER OFFICE
                   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                  DEFENDER ASSOCIATION OF PHILADELPHIA
                   FEDERAL COURT DIVISION
                      Suite 540 West    The Curtis
                      601 Walnut Street
                      Philadelphia, PA 19106
                      (215) 928-1100
                  Victor Abreu, Esq.
                  Peter Williams, Esq.
                  Anna Christensen, Esq.

                  *Counsel for Alexi Saenz*

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

I.      **Introduction**

Alexi Saenz is scheduled to appear before Your Honor on May 21, 2025, to be sentenced,

pursuant to his plea of guilty to Count One of the S-8 Indictment, which charges him with

violating Title 18 U.S.C. § 1962(c), and Count Thirty-Eight, which charges him with violating 18

U.S.C. § 924(c)(1)(A)(iii).  This memorandum is submitted pursuant to Rule 32(f) of the Federal

Rules of Criminal Procedure.  It sets forth the basis upon which Mr. Saenz requests that the

Court impose a term of forty-five years of imprisonment within the terms of the plea agreement,

and pursuant to the Court's authority under *United States v. Booker*, 543 U.S. 220 (2005),

*Kimbrough v. United States*, 552 U.S. 85 (2007), and 18 U.S.C. § 3553(a).

 As discussed more fully below, Mr. Saenz believes that a forty-five-year (540 month)

sentence is fair, given the undeniably broad scope of his acceptance of responsibility for his

participation in the offense conduct underlying the charged racketeering conspiracy involving

multiple horrific murders and other violent conduct, the intellectual and adaptive deficits that

form the basis for his diagnosis of intellectual disability, other more culpable leaders whose

charges were dismissed[1] and who were returned to El Salvador, and his traumatic personal

history of abandonment, abuse and survival.

There can be no disagreement that the level of violence in this case is significant, as is

---

[1] The criminal prosecution of MS-13 high ranking Board of Director member of the *Ranfla Nacionale*, Cesar Lopez-Larios, was dismissed on March 11, 2025.  *United States v. Cesar Lopez-Larios*, 20-cr-577 (JMA) (E.D.N.Y.), Dkt. Nos. 92, 93.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Mr. Saenz's role in some of the violent acts. He makes no excuse and hopes that this Court knows he is not the sum of his crimes. In this submission, we hope that in recounting the commission of his crimes and how he became involved, we will reveal his story of childhood and failure and his personal growth over the last eight years. The United States Supreme Court has said that the Court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *See Koon v. United States*, 518 U.S. 81, 113 (1996). In addition, the Court should consider "the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances." *Id.* at 92. If the sentencing goals in 18 U.S.C. § 3553(a) are to be given any true and meaningful effect, then given all of the information before this Court, including Mr. Saenz's sweeping acceptance of responsibility, the requested sentence of forty-five years for Alexi Saenz, now thirty years old, is not only fair and just, but is sufficient, and not greater than necessary.

## II.  <u>Procedural History</u>

Alexi Saenz was arrested on March 2, 2017, and charged with multiple co-conspirators alleged to be MS-13 members or associates of MS-13 with racketeering, racketeering conspiracy involving violent conduct that was capital-eligible, narcotics conspiracy, and firearm-related offenses. On July 15, 2020, the government gave notice of its intent to seek the death penalty should Alexi Saenz be found guilty of any of the capital charges (Counts 29, 31, 50, 52, 55, 57,

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

62, and 64) alleged in the Seventh Superseding Indictment.  Dkt. No. 1429.  After the

government filed the Notice of Intent to Seek The Death Penalty on the listed counts, counsel for

Alexi Saenz submitted a compelling request to the Department of Justice for deauthorization, and

on November 10, 2023, Attorney General Merrick B. Garland directed that the Notice of Intent to

Seek the Death Penalty against Alexi Saenz be withdrawn.  Dkt. No. 2433.  Additionally, at the

direction of Attorney General Garland, the government was authorized on November 29, 2023,

not to seek the death penalty for a murder charged in the Eight Superseding Indictment, which

had not been charged in the Seventh Superseding Indictment.  Dkt. No. 2423.

On July 10, 2024, pursuant to a plea agreement, Alexi Saenz pleaded guilty to Count One

of the Eight Superseding Indictment, charging him with Racketeering in violation of  18 U.S.C.

§ 1962(c), and Count Thirty-Eight, charging him with a violation of 18 U.S.C.

§ 924(c)(1)(A)(iii).  At his change-of-plea hearing, he admitted his participation in Racketeering

Act 1B, Racketeering Act 2B, Racketeering Act 4B, Racketeering Act 4C, Racketeering Act 5B,

Racketeering Act 6B, Racketeering Act 7B, Racketeering Act 8B, Racketeering Act 9B,

Racketeering Act 10B Racketeering Act 11B, Racketeering Act 13B and Racketeering Act 14.

The plea agreement terms, which this Court has indicated it intends to accept, provide for a

sentence range of at least forty years and no more than seventy years of imprisonment (480-840

months).  The agreed-upon terms of imprisonment and supervised release are not based on the

United States Sentencing Guidelines but are instead the result of thorough negotiation and

consideration by the parties. Mr. Saenz has remained incarcerated at MDC since his arrest on March 2, 2017.

### III.     The Nature of the Offense

The details of Mr. Saenz's role in the charged offenses are described in the Presentence Investigation Report prepared by the Probation Department and will not be discussed at length herein. There are a few corrections of note. Mr. Saenz did not authorize the murders described in Racketeering Act 1B (PSR ¶¶ 34, 113), Racketeering Act 6B (PSR ¶ 49), or Racketeering Act 8B and 9B (PSR ¶ 53). Significantly, Mr. Saenz was not hands-on, nor did he personally kill any of the victims, and for some of the murders, he was not physically present when they occurred.

In accordance with MS-13's very strict rules and protocol, authorization for any murder must come from senior leadership, and failure to obtain authorization will result in one's death. Accordingly, for the murders that Mr. Saenz authorized, his authority was given by a more senior Sailors Clique Leader in New York whose authorization came from the leader of the Sailors Clique for all of the East Coast of the United States, or the New York Leader would first get approval directly from the leadership in El Salvador, and then authorize or order Mr. Saenz to direct the clique members to engage in these horrific murders. Mr. Saenz did participate in his crimes of conviction with knowledge. Although he was not hands-on, he assisted in some way, whether as a lookout, providing transportation to other MS-13 members, or helping to procure weapons, among other things.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

During his change-of-plea hearing, Mr. Saenz admitted to his participation in several racketeering acts that have snuffed out the lives of many young people. With the passage of time and much reflection, it is hard for Mr. Saenz to reconcile the person he is today with the person he was when he committed the crimes. He now recognizes the tragedy is breathtaking for the parents who lost their children   as it is for his mother as well, who struggles to make sense of the conduct her son has engaged in. Mr. Saenz has been making penance since his arrest. He is profoundly sorry, and although he knows the families may not accept his apology, it is sincere, and he accepts full responsibility for his participation in these crimes.

**IV.**   **Application of Title 18 U.S.C. § 3553(a)**

Title 18 U.S.C. § 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary," to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, inter alia. The ultimate goal of the sentencing court is to find just punishment consistent with the objectives of 18 U.S.C. § 3553(a). Forty-five years  the sentence Mr. Saenz respectfully asks the Court to impose  is a significant sentence, and Mr. Saenz's recognizes that his decision to join MS-13 and engage in extremely serious crimes, causing the horrific and tragic loss of lives, mandates severe punishment.

Although we agree with Probation's recommendation of a downward variance from the top of the range of a possible sentence, we believe the recommendation does not go far enough in this highly unusual situation, one with extraordinary mitigation and acceptance of responsibility

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

surrounding this worthy defendant.

In imposing a sentence upon Mr. Saenz, it bears repeating that the Court is reminded to consider his personal and individual circumstances, particularly those that mitigate against a prison sentence, and to take into account his individual circumstances. *Koon*, 518 U.S. at 113. In reaffirming this principle that sentencing must not only consider the history and characteristics of the individual to be sentenced, but such sentencing must be individual and fair, the Second Circuit has held that:

> [a]though the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all circumstances.

*United States v. Jones*, 460 F.3d 191, 195 (2d. Cir. 2006). In light of the Second Circuit's wisdom and directive, we encourage the Court to impose a sentence of forty-five years and to give meaningful consideration to the § 3553(a) factors that warrant a variance. These factors include Mr. Saenz's sweeping acceptance of responsibility, his compelling personal history of brutal abuse, neglect, and abandonment, his intellectual disability, the horrific conditions that he has endured at MDC, including the black-out in 2019 during polar vortex conditions, and the Covid-19 pandemic.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

## V.       **Alexi Saenz's Personal History and Characteristics**[2]

How did we get here? "Recounting the commission of a murder should be aimed at revealing who your client was when he committed the crime and how he came to be that way. This always is a story of childhood and failure . . . We cannot undo the harm, we can only begin to tell the truth to help those who can hear, to care, to know that childhood matters." Keynote Address: "The Challenge of Change" and "Childhood Matters" Monterey, California, February 14, 1992 by Bryan R. Schecmeister.  The concept of "childhood matters" emphasizes the profound impact of early life experiences on an individual's development and future behavior.

### a.       **Alexi Saenz's Childhood in El Salvador**

When undersigned counsel first met Mr. Saenz in 2019,[3] his childlike interactions, the need for constant repetition in his questions, and the answers provided as if he was asking the questions for the very first time during a meeting or at later meetings, his limited focus, for example, were notable.  Over time, with the wealth of information learned about Mr. Saenz's personal history and background, it became clear that the abandonment and ongoing trauma he experienced as a child during his developmental years intruded on his decisions later in life because childhood does matter.

---

[2] Mitigation Specialist Arnaldo Perez Rubio, who has worked on Mr. Saenz's case since 2020, has submitted a report documenting Mr. Saenz's social history. This report, which is filed under seal as Defense Exh. A, provides a detailed description of Mr. Saenz's life.

[3] Mr. Saenz was 24 years old in 2019.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Mr. Saenz was born in the rural town of Montecristo in El Salvador in 1994 to the union of Marta Corea and Ruben Saenz. Marta would have a second child with Ruben and all the while, Ruben was subjecting her to unimaginable verbal and physical abuse that knew no bounds. Ruben's abuse was so severe that whenever Marta learned that Ruben was on his way to her mother's one-room house where she lived, Marta fled with her children, seeking refuge in the mountainous outdoors in the middle of the night. To understand Ruben's rage and Mr. Saenz's abuse and suffering, a brief historical background of Ruben is necessary.

As a child, Ruben was described by his brother as aggressive and argumentative. He expressed suicidal ideations on multiple occasions from the time he was a young child and as an adult. At the age of sixteen, in 1982, Ruben enlisted in the Salvadoran Army and saw combat during the Salvadoran Civil War. In 1987, he stepped on a landmine and suffered significant physical injuries requiring hospitalization. While hospitalized, he was prescribed antipsychotic medication, antidepressant medication, and anti-anxiety sedatives. He was discharged from the Army in 1988. Once he returned to civilian life and was unable to find work, he abused alcohol, was quick to anger, was more violent than he was before, and seemed to always be in a rage, with his son Alexi becoming the primary target of his rage. However, Marta, Roxana, and Alexi's younger brother, Jairo, were not spared. Marta describes Ruben's involvement in their lives as "sheer terror."

By the time Alexi was born, Ruben had moved on and Marta was alone and without

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

support.  She moved in with her mother.[4]  Alexi lived in abject poverty in a small dirt-floor one-room house with no running water.  He lived with his mother, Marta, his maternal grandmother, Mercedes, his older sister, Roxana, and younger brother, Jairo.  Food was scarce, and not eating a meal for an entire day was not unusual but a frequent occurrence for Marta and her children.  This food deprivation would continue long after Marta fled to the United States in search of a better life and to escape the wrath of Ruben, who seemed intent on beating her to death.  Alexi was only three years old when Marta left.  Unfortunately, Marta's departure to the United States left three-year-old Alexi at the mercy of his abusive father, who inflicted unspeakable physical and emotional pain upon him for the next two years until he committed suicide.  The promise of reuniting with his mother waned as one year became two years, and then three years, until it was thirteen years later before he would see his mother again, a woman who was by then, a stranger to him.  Marta's departure for the United States left Alexi feeling a deep sense of abandonment and rejection, emotions that permeated his life for many years.

Before she left for the United States, Marta was industrious and would find work in El Salvador so that she could support and provide for her children.  Yet Ruben would come to her workplace, take her money, and physically assault and verbally abuse her.  Ruben would cause her to lose her job, and as soon as she could find another job, the cycle would repeat itself.

---

[4] However, Ruben would show up unannounced to harass, threaten, control, and sought Marta's compliance in whatever he desired through fear.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Marta's daily beatings extended to Alexi as well.  Marta describes Ruben punching and kicking Alexi in the head while asking young Alexi, "Why don't you die? It would be better if you died." Once Marta immigrated to the United States, Alexi and his two siblings were left in the care and custody of Marta's mother, Mercedes, who did her best to shield them from Ruben's uncontrollable wrath.

However, Mercedes could not leave the house when Ruben showed up unannounced to hide Alexi, Jairo, and Roxana in the mountainous outdoors as Marta did because she was not physically able to.  Alexi no longer had the protection of his mother.  Once Marta left, Alexi had no protection from his diabolical father.  Whenever Ruben showed up to the house unannounced, young Alexi would begin crying and shaking uncontrollably.  He was afraid of his father.  Ruben would hang Alexi and Jairo by his neck with a belt and, at other times, drag Alexi into the street, hoping that an oncoming car would run him over or make him kneel on the ground outside for several hours.  Sometimes, he would take him down a local river late at night and force him into the cold water or shoot bullets underneath his hammock while he was lying in it.  During one particular brutal assault, his sister Roxana, fearing that Ruben would likely kill Alexi, ran to her cousin to get help to stop Ruben.  The cousin used a log to stop Ruben, and although Ruben turned his rage on the cousin, it was the one time someone dared to intervene.  Everyone feared Ruben.  Ruben's abuse permeated every aspect of Alexi's life.  Ruben would even check Alexi's mouth to see if he had eaten after Ruben had ordered Mercedes not to feed him.  Whenever

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Mercedes was able to give Alexi food, she would wash his mouth out and dry it with a rag to erase any trace that he had eaten when Ruben checked Alexi's mouth. Ruben's reign of terror came to an end in March 1999 when he committed suicide by drinking poison. Although he had also prepared a dose of poison for young Alexi as well, he drank his poison first. Alexi was five years old when his father died. The memories of his father's abuse have haunted him his entire life.

Alexi believes that his father robbed him of his mother during the most critical period of his life. Although he ultimately traveled thousands of miles from El Salvador to New York to find her, it was a bittersweet reunion. In 2011, thirteen years had passed since he last saw his mother, and he was having trouble remembering her despite monthly telephone calls with her. Since his mother's departure, the promise of reuniting seemed empty as each year's promise of reuniting became another year of waiting.

Alexi's childhood was also characterized by pervasive developmental impairments[5] spanning multiple areas of his life. Whether at home, in school, or the community, he was consistently described as slow to learn, hard to teach, and behind his peers in any task requiring comprehension, attention, or memory. For example, at school, he was retained twice in the first grade, given significant one-on-one attention from his teacher, and stood out as delayed. When

---

[5] An addendum addressing Mr. Saenz's diagnosis of intellectual disability, along with attachments thereto, is attached as Defense Exh. B.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

he finally did move on from the first grade, even though he was two years older than his

classmates and had two extra years of cognitive development, he was identified as one of the

slowest students in his class, was placed in the equivalent of a special education program, and

continued to lag behind his peers despite receiving years of educational support. He was bullied

at school for being delayed, gullible, and easily taken advantage of socially. When other kids

bullied him or beat him up, he would not fight back. He would cry, he was quiet and withdrawn,

and after Ruben's death, he seemed to be in constant fear. He lacked the wherewithal to acquire

everyday living skills that his peers took for granted.

These impairments were present in the United States as well. After enrolling in Islip

High School in 2011, Alexi audited ninth grade classes and failed to receive credit in every

academic class he took for the next three years. Despite his failing grades, he was socially

promoted to the tenth and eleventh grades, was eventually retained in the eleventh grade, and

dropped out of school while going through the eleventh grade a second time. He was described

as "slow," socially immature, and someone who lacked the ability to live independently.

This history is hardly surprising, given Alexi's intellectual and cognitive impairments. At

age twenty-six, he was administered a comprehensive battery of neuropsychological testing. This

battery reflected an IQ of 72    the bottom third percentile    academic functioning at the

elementary-school level, and impairments in every other area of brain functioning tested. Alexi's

cognitive profile reflects a global deficit spanning all higher level areas of brain functioning -

such as reasoning, problem solving, decision-making, learning, and impulse control - consistent with his long history of developmental delays, gullibility, and other deficits set forth above.

As set forth in detail in Exhibit A and the attachments thereto, given the results of his IQ, neuropsychological, and academic testing and his lifelong history of impairments, Alexi Saenz has been diagnosed with intellectual disability. But regardless of the specific diagnosis, he is a person with significant impairments.

### b. Journey from El Salvador

On January 30, 2011, at sixteen, and longing to reunite with his mother, Alexi embarked on the treacherous journey from El Salvador to the United States. The overwhelming heat during transport was palpable, and he observed many people passing out from heat exhaustion and having no water. Alexi spent the initial leg of the journey riding in a bus packed with people, which took him to the Guatemalan border. There, he and many others waded through a waist-deep river, and once he arrived in Guatemala, he rode in several buses until he reached Puebla, Mexico. He was put on a train and several buses with many others in Mexico until he arrived near the U.S./Mexico border. Alexi and many others walked many hours to cross the border into Arizona on March 18, 2011. When the Border Patrol Agent approached him, he did not run. He provided his mother's telephone number. He was then transported to Chicago and placed in a facility where he attended school. Several weeks later, Alexi was put on a plane to New York to be reunited with his mother, who met him at the airport.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Alexi was sixteen when he disembarked from the plane in New York to meet his mother, whom he had last seen thirteen years ago when he was three. He was ill-equipped to feel connected to the stranger who was, indeed, his mother, the woman he had yearned for since he last saw her when he was three years old, was holding him in a tight embrace.

He soon learned Marta had a new family with a husband, Lazaro, and children. There was something familiar to Alexi about Lazaro. Lazaro was a heavy drinker, just like Alexi's father, and Lazaro became intolerable when he drank, subjecting the family to verbal and physical abuse. Alexi found escape in playing with his young sisters, Christina, approximately eight, and Mercy, approximately three. His mother observed that he played with his sisters' toys and naturally engaged with them as if he were six or seven years old, not the teenage boy he was. Marta further observed that Alexi did not have an adult mentality, that his mind did not seem to have grown, and that he was gullible and trusting.[6]

Alexi also found reprieve from his stepfather at Islip High School. Despite only having a sixth-grade education in El Salvador and not knowing how to speak, read, or write in English, he was placed in the ninth grade in mid-cycle. He was subsequently placed in the 10th grade, and he struggled to grasp even simple concepts, leading to frustration and ultimately quitting school.

---

[6] Letters of Support are attached as Defense Exh. C.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

c.    **MS-13 Grooming**

During his short time at Islip High School, Alexi befriended the Latino kids in school and those in his community, who were the only kids who spoke Spanish and with whom he could communicate easily.  Alexi was offered friendship and familiarity with kids from El Salvador.  At first, there was no indication that any of them were engaged in criminal conduct or were associates or members of MS-13.[7]  That discovery would come much later when it was too late.  The grooming was deliberate, and in retrospect, Alexi felt he missed all the signs.  They would get together and hang out, drink alcohol, and smoke marijuana.  Sometimes, they played soccer, and at other times, they ate at a local restaurant.  Someone in the group would cover his meals and drink, and each time that act of kindness was shown, he was reminded that he was now *family* and that *family* took care of each other.

Alexi noticed the group's disagreements with random strangers for inconsequential reasons that would sometimes turn physical.  But now his group of friends, *his family*, would help protect the agitator who claimed the stranger wronged him.  And because Alexi was receiving such protection, the promise that he would not have to fear any abuse from his stepfather because they would ensure that he was safe from physical abuse, that they would protect him from the bullies and gangs at Islip High School, he was expected to reciprocate

---

[7] Unbeknownst to Alexi, his new community in Brentwood, Long Island, had one of the highest concentrations of MS-13 members in the North East region who actively recruited members to fill their ranks.  His home and school were in the middle of the lion's den.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

because nothing was truly free.

Initially, the tasks were simple. Alexi would be sent to the store to buy food or beer, and the object of the errand was to see if he could complete simple tasks and that he did not steal the money he had been given. Somewhere between the free meals, the free marijuana to smoke at will, free alcohol, eating out at restaurants with his friends at no expense to him, the camaraderie on the soccer field, and the benefit of their company, evidence of MS-13 was on display. Alexi had been drawn into the very gang that had extorted his grandmother and from whom he wanted no part in El Salvador. The seduction to joining the gang was slow but deliberate and initially masked as a group of young people getting together. Alexi lacked the depth of understanding and intellectual acuity to understand that joining the gang meant no way out. "Gang membership is generally considered a lifetime commitment." Dkt. No. 2438 at 2.[8]

The manipulation and control by MS-13 are powerful, and Alexi's many impairments left him vulnerable to its influence. With brain-based deficits in his ability to make good decisions, reason and solve problems, and control his impulses, he was easily influenced, gullible, and vulnerable to a gang that plied him with all of the things that was lacking in his life. Once he joined their ranks, he was expected to participate in the senseless crimes that he has admitted to. Once you become a member of MS-13, it is well known that your loyalty to the gang is your

---

[8] *See* Government's Sentencing Submission, *United States v. Hernandez*, No. 16-cr-403 (E.D.N.Y.), Dkt. No. 2438, at 2.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

ticket to survival because, as Alexi learned, once you join MS-13, three things are certain: MS-13 will kill you if they suspect you are disloyal, you will go to prison if you survive, and you will likely die in prison. Membership in MS-13 has only bleak outcomes. Here, again, his impairments made him more vulnerable, as he was more likely to obey the directives given to him by his superiors regardless of their consequences and to go along with the culture of the gang. Once inducted into MS-13, the pressure to comply with the wishes of his superiors was extraordinary. Given his impairments, Alexi was uniquely ill equipped to resist this pressure.

### d. MDC-Brooklyn

By the time Alexi Saenz appears before this Court for sentencing, he will have endured eight long years at MDC-Brooklyn in pretrial detention. His pretrial detention at MDC has been marred by some of the most inhumane conditions, including the 2019 blackout during a severe New York winter, the Coronavirus pandemic in 2020, and the constant lockdowns that have become the norm.[9]

On January 27, 2019, after he had been at MDC for less than two years, things for Mr. Saenz got seriously worse when the facility lost power during a week of temperatures hovering at 2 degrees in New York City. This frigid weather swept over the Midwest and Northeast. There

---

[9] *See* Affidavit from former Bureau of Prisons Warden, Maureen Baird, detailing the long history of persistent challenges that have plagued MDC, and the urgent need for comprehensive reform, attached at Defense Exh. D. Ms. Baird's CV is included as an attachment to her Affidavit.

was no hot water or heat, and Mr. Saenz's metal cell was cold. Wearing every piece of clothing he owned made little difference in his attempt to keep warm. There was no access to medical care, and to Mr. Saenz, it appeared that no one in authority at the Bureau of Prisons cared. He endured the deplorable and frigid temperatures for about eight days.

The lack of electrical power aggravated the conditions at the jail, and the jail had abandoned its usual routines, with inmates kept on lockdown for safety reasons. This Court is fully aware by now, based upon the extensive media coverage and multiple court hearings in the Southern and Eastern Districts, of the massive failure of MDC and the desperation of detainees seeking help. *United States v. Colucci*, 743 F. Supp. 3d 452 (E.D.N.Y. 2024) (Brown, J.); *see also, e.g.*, *United States v. Ozols*, No. 16-cr-692 (JMF) (S.D.N.Y.) (Furman, J), Tr. 2/12/19 at 30-31 (sentencing transcript); *United States v. Acosta De La Rosa*, No. 18-cr-667 (PKC) (E.D.N.Y.) (Chen, J.), Tr. 6/4/19 at 12 (sentencing transcript). The media coverage played a crucial role in bringing to light the human crisis of epic proportions that seemed to have worsened with each passing day. But for the media coverage, the horrors of the inmates at MDC, including Alexi Saenz, existing in conditions that are akin to that of a third-world country during this time would have never come to light.

And then came the Coronavirus pandemic in 2020. This Court is well aware of the ongoing suffering and isolation of the inmates at MDC, the staff shortage and its impact on the level of care extended to the inmates in MDC's care, the round-the-clock lockdown, and the

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

vestiges of never-ending lockdowns that are still commonplace at the jail today. It is our

considered belief that given the unusually harsh conditions that Mr. Saenz has experienced at

MDC, warrants consideration and an adjustment of his sentence. *See, e.g.*, *United States v.*

*Chavez*, 710 F. Supp. 3d 227, 229 n.6 (S.D.N.Y. 2024) (Furman, J.); *United States v. Santana*,

No. 22-cr-368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (Marerro, J.); *United*

*States v. Gonzalez*, No. 18-cr-669 (JPO) (S.D.N.Y.), Tr. 4/2/21 at 17 (sentencing transcript);

*United States v. Latney*, No. 18-cr-606 (E.D.N.Y.), Tr. 10/5/20 (sentencing transcript).

     e.      **Infractions, Employment, Medical and Accomplishments at MDC**

Mr. Saenz's time at MDC has not been without incident. See PSR ¶ 214. His maturity

during the last eight years, despite his infractions, which he quickly took responsibility for and

which mostly occurred in 2018 and 2020, has earned him the respect and trust of the MDC staff.

When tempers flare, he is seen as calm, quiet, and a peacemaker among his peers. His penchant

for peace is not only observed in the general population, where different gang members are

housed and co-exist together peacefully, but also in the unit where all MS-13 members are

housed exclusively together. Mr. Saenz's positive influence, calm demeanor, ability to work

well with others, and well-earned trust of MDC staff have made him a highly desirable candidate

for work assignments at MDC over the years.

Within a few months of his arrival at MDC, on August 3, 2017, Mr. Saenz began working

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

and he has generally worked steadily as a unit orderly or as a kitchen worker since that time.[10]

During the unassigned work assignment, Mr. Saenz was frequently called upon to assist in work

projects at MDC when he was not formally working on his steady job assignment. These

informal work projects are generally not entered into SENTRY. One such informal work project

began on or about December 21, 2021. Mr. Saenz was trusted to have free movement for the next

two weeks when he was assigned to paint the common areas outside his unit area from Monday

through Thursday between 1:00 a.m. and 6:00 a.m. Mr. Saenz has been unable to work since

October 2024 because he sustained a complete tear of his right Achilles tendon, which has not

only caused him immense pain but following foot surgery to repair his ankle, he has had limited

mobility.

Historically, educational programs for inmates at MDC have been sporadic, with

cancellations occurring frequently due to the lack of staff or because of other administrative

decisions. Understandably, programs were not offered during the pandemic, but long after the

pandemic ended, no programs were being offered. However, Mr. Saenz signed up for programs

whenever they were offered, and over the years, he has successfully completed many programs.[11]

Although the classes he has taken are varied, he has taken "The Coping Skills Psychology

Workbook" in August 2024, "The National Parenting Program" in October 2024, and "The

---

[10] Mr. Saenz's most recent Work Performance Worksheet is attached as Defense Exh. E.

[11] Certificates of completion are attached as Defense Exh. F.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

Managing My Emotions Psychology Workbook" in March 2025.  For Mr. Saenz, these courses

are an attempt for him to understand and process how he could have participated in such horrific

crimes that caused so much harm to another human being.  Mr. Saenz feels that the *present* Alexi

is a more mature Alexi who cannot abide by his past.  The parenting program has given him a

basic understanding of the role of a parent.  Although he accepts that his mother did what she had

to do to save herself from his brutish father, and with the intent to rescue him, he cannot help but

wonder whether his mother fulfilled her obligation to him as a parent.

**VI.**   **A 480-Month Sentence Is Consistent with the Sentencing Guidelines**
**Because It Would keep Mr. Saenz Incarcerated for Most, if not All,**
**of His Remaining Life**

Based on the offense conduct to which Mr. Saenz pled guilty,[12] the USSG advisory

sentence in this case is life in prison.  PSR ¶ 238.  However, the negotiated sentencing range is

not based on a guideline calculation.  Nonetheless, the recommended sentence of 540 months is

consistent with the advisory guideline life sentence.

The average life expectancy for a Hispanic male in the United States is 74.6 years.  *See*

Elizabeth Arias, *et al.*, *United States Life Tables*, 2021, 72 National Vital Statistics Reports 12, at

3 (November 7, 2023).  However, it is generally accepted that serving time in prison shortens

one's life expectancy.  *See United States v. Taveras*, 436 F. Supp. 2d 493, 500 (E.D.N.Y. 2006),

---

[12] Mr. Saenz's criminal history is zero, establishing a criminal history category of I; he
has no juvenile adjudications or adult criminal convictions.  PSR ¶¶ 197-199.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

*aff'd in part, vacated in part on other grounds sub nom. United States v. Pepin*, 514 F.3d 193 (2d

Cir. 2008) (life expectancy within federal prison is considerably shortened because of stressors,

violence, and disease).  Studies show that the decline is as much as two years for each year of

incarceration.  *See* Nick Straley, *Miller's Promise: Re-Evaluating Extreme Criminal Sentences*

*for Children*, 89 Wash. L. Rev. 963, 986 n.142 (2014) ("A person suffers a two-year decline in

life expectancy for every year locked away in prison."); Evelyn J. Patterson, *The Dose  Response*

*of Time Served in Prison on Mortality: New York State*, 1989  2003, 103 Am. J. Pub. Health 3 at

526 (2013) (same).

　　For these reasons, the United States Sentencing Commission defines a *de facto* life

sentene as one of 470 months (just over 39 years) or more, "a length consistence with the average

life expectancy of individuals sentenced for federal offenses given the average age of those

persons."  U.S. Sent. Comm'n, 2023 *Annual Report and Sourcebook of Federal sentencing*

*Statistics,* Appendix A.  *See also United States v. Nelson,* 491 F.3d 344, 349-50 (7th Cir. 2007).

　　Mr. Saenz is thirty years old.  Even in a non-carceral setting, his remaining life

expectancy would be just over forty years, which is in the range of 470 months (39.2 years) that

the Sentencing Commission defines as a *de facto* life sentence, and five years less than the

requested forty-five-year (540 months) sentence.  However, since he is a prisoner who has

already been in custody for eight years, Mr. Saenz's life expectancy is considerably lower.

Assuming a diminishment in life expectancy of two years for every year of incarceration (as cited

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

above), Mr. Saenz's remaining life expectancy is significantly shorter than the terms of the

proposed sentence.  Even accounting for Mr. Saenz's eight years in federal pre-trial custody, the

requested 540-month prison term would result in a sentence that is beyond the life expectancy of

a Hispanic male, like Mr. Saenz, who is incarcerated.  To state it plainly, imposition of the

requested 540-month sentence would render it highly likely that Mr. Saenz will spend the

remainder of his life in prison.[13]

## <u>Conclusion</u>

The young man that counsel have come to know over the last few years is a person who is

deeply affected by the fact that he engaged in the crimes of conviction.  He is a man who

constantly asks for help to be a better person and a man who wants concrete terms for how he can

be better.  Mr. Saenz is on a journey of redemption, honest and pure in his intentions.  And while

Mr. Saenz understands that he faces a significant sentence of at least forty years for his crimes, he

sincerely hopes that this Court will consider his personal history, his acceptance of responsibility,

and all of the information provided to the Court and show him mercy.

While the probation department has calculated an estimated guidelines range, the parties

have agreed upon a sentencing range.  Nevertheless, punishment must be imposed

parsimoniously and with respectful consideration for the individuality of Alexi Saenz, who has

---

[13] In addition, because Mr. Saenz is not a United States citizen, he will be subject to immediate deportation in the unlikely event that he is eve released from prison.  *See* U.S. Probation Dep't Sentence Recommendation at 4.

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

participated in highly aggravated crimes but has presented this Court with significant mitigation that compels the requested sentence by counsel.

In determining the appropriate sentence, the Court is encouraged to avoid austere adherence to averages and generalities, which ignore the circumstances that are personal and unique to Mr. Saenz. Counsel have taken the liberty of including a passage from the summation of Clarence Darrow in the Leopold-Loeb murder case. It is a passage that, when considered with the expert and sensitive mitigation report submitted to the Court, resonates with counsel and we hope it will resonate with Your Honor.

> If there is such a thing as justice it could only be administered by one who knew the inmost thoughts of the man to whom he was meting it out. Aye, who knew the father and mother and the grandparents and the infinite number of people back of him. Who knew the origin of every soul that went into the body, who could understand the structure and how it acted. Who could tell how the emotions that sway the human being affected that particular frail piece of clay. It means more than that. It means that you must appraise every influence that moves them, the civilization where they live, their living, their society, all society which enters into the making of the child! If Your Honor can do it if you can do it you are wise, and with wisdom goes mercy.[14]

Sentencing is a "fluid and dynamic process." *Irizarry v. United States*, 553 U.S. 708, 715, 128 S. Ct. 2198, 2003 (2008) (citing *United States v. Vega-Santiago*, 519 F.3d 1, 4 (1st Cir. 2008) (en banc)). And "[w]hile there are many compelling considerations in every sentencing

---

[14] Attorney for the Damned, Clarence Darrow in the Courtroom, Edited by Arthur Weinberg: University of Chicago Press (157, 1989).

*U.S. v. Alexi Saenz, S8 16 Cr. 403 (GRB)*

decision, a sentencing judge must have some understanding of the diverse frailties of human kind

[,] . . . what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d

Cir. 2017).

The parties did not negotiate the terms of the plea agreement lightly. As Your Honor

recognized at the change of plea hearing, it was a thoughtful and reasonable resolution. Mr.

Saenz took responsibility and avoided the retraumatization of the victims at a public trial and the

enormous expense.

Mr. Saenz asks for a compassionate sentence of forty-five years for all of the foregoing

reasons. Thank you for your attention and consideration of this submission.

Respectfully,

/s/ *N. Todd*
Natali Todd, Esq.
Victor Abreu, Esq.
Peter Williams, Esq.
Anna Christensen, Esq.

*Counsel for Alexi Saenz*

cc: Counsel of Record
    Mr. Alexi Saenz

Dated: April 30, 2025
       Brooklyn, NY