Defense Exh. D

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

UNITED STATES

                Plaintiff,

                                    Case No: 16-CR-403

    v.

Alexi Saenz

                Defendant.

_____

      I, Maureen P. Baird, declare the following:

## INTRODUCTION

1.     I am currently employed as an independent prison consultant specializing in federal corrections. From March 1989 through September 2016, I worked for the Department of Justice, Federal Bureau of Prisons (BOP), in various capacities. I began my career as a case manager and concluded it as a Warden. I was appointed Warden at the Federal Correctional Institution in Danbury, Connecticut, and later promoted to Warden at the Metropolitan Correctional Center (MCC) in New York City. There, I was appointed to the Senior Executive Service by the United States Attorney General. Within two years, I transferred to a position of greater responsibility as the Warden of the United States Penitentiary (USP) in Marion, Illinois. As Warden at USP Marion, I led and directed 300 to 350 staff members and managed approximately 1,500 prisoners. Both MCC New York and USP Marion prisons included specialized inmate

1

housing units, which also featured high-security management units. During my seven-year tenure as Warden, I oversaw each prison's overall operations and components. I am thoroughly knowledgeable about the operations, procedures, and policies of the BOP.

2.      My professional experience of working in federal corrections included many areas. In three BOP Regional Offices where I was assigned, my duties included the classification and designation of newly committed inmates, as well as reviewing and approving inmate transfers to other federal prisons. Initial designations and subsequent transfers required a thorough review of the inmate's complete pre and post commitment record, to ensure accurate placement at an appropriate security level prison. During my tenure at Regional Offices, I conducted after-action investigations following significant prison incidents such as homicides, serious assaults, gang related disturbances, and suicides and prepared a written report of my findings for the Regional Director. Further, I was responsible for inmate grievances pertaining to all topics related to correctional programs, including appeals related to the discipline policy.  As a Unit Discipline Committee chairperson during my assignments as case manager and case management coordinator, I conducted hundreds of discipline hearings and meted out disciplinary sanctions to inmates, following a finding of guilt.

3.      Over the course of my career, I was tasked with developing new BOP policies and revising and modifying existing correctional policies. Throughout my 27-year career with the Agency, in all my positions, I was responsible for assessing inmate risk, formally and informally. This risk assessment was especially critical when an inmate was being considered for a prison transfer or a community program.

4.    Since retiring from the BOP, I have maintained contact with numerous former colleagues, including those currently working at the Metropolitan Detention Center (MDC) in Brooklyn, New York. They regularly update me on the institution and the Agency. Since early 2017, I have been working as an independent prison consultant, offering expert testimony in district and state courts nationwide on BOP policies, inmate adjustment, and prisoner care. I have consistently been recognized as a qualified expert witness.

5.    I stay informed about new policies, laws, developments, events, and procedures that directly impact the BOP. I achieve this by reviewing after-action investigation reports following significant events within the BOP and observing U.S. Senate Judiciary Committee Oversight hearings that examine BOP's management, operations, and the recent crisis-level staffing shortages. Additionally, I keep up to date on news and reports related to federal prisons. Furthermore, I observe House Appropriations and House Committee on the Judiciary hearings concerning the BOP, where discussions often cover similar topics as the Senate hearings.

6.    A copy of my resume, which includes my relevant work experience, is attached to this report as Exhibit A.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

## SCOPE OF WORK

7.      Victor Abreau, Supervisory Assistant Federal Defender, and Natali Todd, Esq., who

represent Alexi Saenz, the defendant in this case, contacted me. They requested that I

prepare a report detailing the significant issues affecting the MDC in Brooklyn, New

York, including violence, drug and contraband problems, understaffing, corruption,

and other concerns.

8.      I was also asked to expound on Mr. Saenz's adjustment during his pretrial

commitment at MDC and how his adjustment might reflect his incarceration for his

future years in prison. Specifically, I will examine how these issues affect all inmates

at MDC, even those who were not contributors to these problems.

## OVERVIEW

9.      This report provides a comprehensive analysis of the significant issues affecting the

MDC in Brooklyn, New York. It highlights the persistent challenges, including

violence, contraband smuggling, staff corruption, and severe staffing shortages, that

have plagued the facility. Drawing on my extensive experience in federal corrections

and insights from my tenure as Warden at MCC New York, this report aims to shed

light on the systemic operational challenges at MDC Brooklyn and the urgent need

for comprehensive reform to ensure the safety and well-being of both staff and

inmates. Additionally, the report details some of Mr. Saenz's experience while in pretrial detention at MDC.

10.    I reviewed numerous BOP records, including disciplinary, education and programming certificates, work history, and others in preparation for this report. I also accompanied Mr. Abreu and Ms. Todd and met with Mr. Saenz during a legal visit at the Brooklyn prison on October 4, 2024.

11.    One of my former colleagues and close friends, Sekou Ma'at, served as Warden of MDC Brooklyn from 2022 to 2023, during the time Mr. Saenz was housed at the facility. In preparation for this report, I spoke with Mr. Ma'at, who confirmed that many of the operational and systemic challenges faced by MDC were directly linked to the violence occurring at the institution during his tenure. We had extensive discussions about the problems I encountered during my tenure at MCC New York, and he shared how he experienced similar concerns during his time as Warden at MDC. Relevant information from these discussions will be provided throughout this report.

**EXECUTIVE SUMMARY**

12.    The former MCC New York and the MDC in Brooklyn have long struggled with similar operational issues. The closure of MCC by the Department of Justice (DOJ) in 2021 did not transfer its problems to MDC; these challenges were already present. However, the focus that was once on MCC has now shifted to MDC.

5

13.    Both facilities have faced numerous difficulties, including staffing shortages, unstable leadership, corruption, scandals, violence, and contraband smuggling. These operational issues have led to an increase in violence at MDC in recent years. These problems are frequently reported and discussed by judges, federal defenders, attorneys, media, inmates, and their families. The wide range of concerns, such as inadequate medical care, inmate abuse, infrastructure problems, and other systemic issues, have significantly influenced decisions by U.S. District Courts in the Eastern and Southern Districts of New York over the past two years.

14.    The persistent challenges at MDC Brooklyn, including violence, contraband smuggling, and inadequate medical care, have significantly influenced judicial decisions in the Eastern and Southern Districts of New York. Concerns about the conditions at MDC have been expressed by Judges in these Districts and in some instances have led to decisions of reduced sentences, compassionate releases, and even decisions to avoid incarcerating defendants altogether if it meant they would be held at the Brooklyn facility.

15.    Despite the numerous challenges and systemic issues faced by MDC Brooklyn, Mr. Saenz has demonstrated significant growth and maturity during his pre-trial detention. Entering prison at the young age of 21, he has faced numerous challenges but has shown remarkable resilience and a commitment to self-improvement. His ability to mediate conflicts and foster cooperation among inmates has played a crucial role in reducing incidents of violence within his housing unit. His peaceful and calm demeanor has contributed to a more stable and controlled environment, benefiting both his fellow inmates and the overall atmosphere at MDC Brooklyn.

16. In this report, I will discuss Mr. Saenz's progress, the skills he has developed, the trust he has earned from staff, his pattern of steady work, formal and informal assignments, and how his actions and behavior are indicative of what his future years in prison may look like. His commitment to completely withdrawing from gang involvement is a testament to his dedication to change and self-improvement. Despite the risks involved in distancing himself from gang activities, Mr. Saenz's maturity and positive influence will serve him well as he navigates the many years of incarceration he is facing.

## TECHNOLOGY, SECURITY CAMERA SYSTEMS, INVESTIGATIONS, INTELLIGENCE, AND INMATE CENTRAL FILES IN FEDERAL PRISONS

17. Despite advancements in technology and security measures over the years, the BOP still falls short compared to other corrections departments and government agencies. For example, many institutions have outdated camera systems, and some security cameras are not operational. The camera system upgrade project at MDC Brooklyn was started but remains incomplete, which hampers investigators' ability to conduct thorough investigations after significant incidents.

18. According to the Office of the Inspector General (OIG), inmates are aware of the blind spots and poor quality of the outdated camera systems in many prisons. In October 2021, the OIG published a report titled "Notification of Needed Upgrades to the Federal BOP' Security Camera System," which recapped how, five years earlier in 2016, the OIG had identified significant deficiencies with the camera system and urged the BOP to evaluate and identify needed upgrades.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

19.     The report noted an insufficient number of cameras, with many areas of the

institutions not covered, resulting in alleged misconduct incidents not being captured.

The 2016 report also highlighted issues such as poor-quality video, inadequate video

storage, and inoperable cameras. The OIG stated that these deficiencies in the BOP's

camera systems had negatively impacted their investigations and their ability to

prosecute serious incidents, including sexual assaults, the introduction of contraband,

inmate deaths, and more. Furthermore, the OIG report indicated that these camera

concerns also affected the work of other law enforcement investigative agencies.

https://oig.justice.gov/sites/default/files/reports/22-001.pdf[1]

20.     During the OIG's 2021 inspection, it was noted that the BOP had only implemented

upgraded camera systems at 45 of its 122 federal prisons, which is about 37%. The

OIG did not specify which institutions received the upgrades but provided a

breakdown by security level.

21.     The BOP uses a primary mission support database called SENTRY. For many years,

inmate Central Files were not accessible electronically and were primarily maintained

in file folders. While hard copies of Central Files are still maintained for each inmate

at every institution, the files are now also managed electronically.  The Central File is

divided into sections of disclosable records and non-disclosable documents. The non-

disclosable section, also known as the Privacy Folder or FOIA Exempt section,

contains protected information.

---

[1] Office of the Inspector General, U.S. Department of Justice. *Review of the Federal BOP' Contract with the Miami-Dade County Corrections and Rehabilitation Department to House Federal Detainees*. U.S. Department of Justice, October 2021. https://oig.justice.gov/sites/default/files/reports/22-001.pdf.

22. The Privacy Folder contains Central Inmate Monitoring (CIM) status and information related to the rationale for an inmate's CIM assignment. CIM is a system that controls and tracks inmate transfers, temporary releases, and community activities. Inmates with CIM assignments require extra management attention to ensure safety and contribute to the orderly running of federal prisons. There are various categories of CIM assignments, and inmates may have more than one assignment.

23. There are seven CIM assignment classifications: Witness Security cases, threats to government officials, broad publicity, disruptive groups, state prisoners, special supervision, and separation. The most commonly used classification is separation, which applies to inmates who cannot be housed in the same institution as certain other inmates. It is especially important for BOP staff to review separation assignments and separatees regularly to ensure inmates are not incarcerated in the same institution in error.

24. The one major exception for separatees being housed in the same prison are administrative detention facilities, and in those instances where individuals are located in the same prison, they are not allowed to be held in the same housing unit and extra security precautions need to occur to ensure they do not encounter each other during medical appointments, education classes, or religious programming.

25. The BOP' Trust Fund Network (TRUNET) is an administrative network infrastructure for BOP staff, offering various applications for different purposes. One of the primary applications used for intelligence gathering and information input following significant incidents is TRUINTEL. TRUINTEL is mainly utilized by Special

Investigation Systems (SIS) staff to manage investigations and track internal and criminal cases. The system contains information on informants, inmate gang affiliations, investigative case files, evidence collection and storage, reports, and tracks cases referred for prosecution.

26. TRUSEEQ is another application in TRUNET which allows institution Executive Staff to view various applications, including the information contained in TRUINTEL. TRUSCOPE is the main application corrections officers use to record various details about their shifts. It is employed for verifying inmate count times, rounds of the housing units, searches, and entering noteworthy or relevant information about a group of inmates or a particular inmate.

## INVESTIGATIONS AND INTELLIGENCE GATHERING WITHIN BOP INSTITUTIONS

27. The BOP conducts investigations for various matters. Depending on the situation, some investigations are more formal and involve a team of individuals, while others are less formal and involve fewer people. Allegations of staff wrongdoing and misconduct investigations are handled differently than incidents involving inmates. For the purposes of this report, I will primarily focus on investigations following significant incidents involving inmates.

28. For major incidents, an institution will almost always undergo an After-Action Review, which is conducted by a group of individuals selected by the Regional Director or the Assistant Director of Correctional Programs. This team conducts on-site reviews, interviews staff and inmates to determine the cause of the incident,

considers factors that may have contributed to the event, and makes recommendations on adjustments the prison should make to reduce the risk of recurrence. A formal report is then drafted for the Regional Director's signature and forwarded to the Warden of the institution where the incident occurred

29.    For significant incidents such as serious assaults, homicides, and large-scale riots, the BOP, specifically the Special Investigation Systems (SIS) staff, conducts its own investigation alongside the FBI. Despite the best intentions of BOP and SIS to conduct thorough investigations, they are not perfect. Before the FBI arrives at the institution, BOP staff are required to cordon off the area and secure the incident scene. They strive to do this as quickly as possible; however, this is not always feasible, leading to crime scenes and evidence being tampered with and compromised.

30.    Federal prisons have Evidence Recovery Teams (ERTs), typically comprised of individuals assigned to the Special Investigative Services department. These employees are trained in evidence collection techniques, fingerprint collection, photography, and sketch documentation. While ERTs are well-intentioned, errors can occur, evidence can be missed, the chain of custody can be lost, and other mistakes can happen.

31.    Recent staff shortages and other problems MDC is experiencing have impacted intelligence gathering. When SIS or Corrections Officers are not able to properly gather intelligence, it can result in homicides, assaults, and other significant incidents and events that could be avoided and quashed before they occur. Staff are not

expected to respond to a significant incident if it means placing themselves in imminent danger or if it appears to be a hostage situation. In such cases, they are required to wait until sufficient staff arrive to contain and lessen the threat.

**INSIGHTS FROM MY TENURE AS WARDEN AT MCC NEW YORK:**

**UNDERSTANDING MDC BROOKLYN'S CURRENT CHALLENGES**

32.     Before retiring from the BOP in 2016, I held the position of Warden at three federal prisons. During my tenure as Warden at the (MCC) in Manhattan from 2014 to 2015, I frequently visited the MDC in Brooklyn. Due to their close proximity and similar missions, MCC and MDC were often regarded as sister institutions. Both facilities primarily housed pre-trial offenders and operated under similar policies and procedures. The issues and challenges I encountered at MCC were also present at MDC. Although the decision to close MCC was made, MDC continued to face problems, and these issues worsened as the conditions at MDC deteriorated, as evidenced by regular reports in the news, official documents, and judicial decisions.

33.     As the Warden of three federal prisons, one of my main duties was to ensure the safe operation of the institutions under my supervision. Upon my initial assignment to the MCC, I was immediately confronted with serious concerns about the facility. The institution faced significant infrastructure issues that required urgent attention, and many parts of the building were in a state of disrepair.

34.     There were concerns about staffing shortages, which forced corrections officers to work 16-hour double shifts, followed by only an 8-hour break before returning to

their posts. For those with lengthy commutes of one to two hours, this often resulted in just a 4-hour break before having to return to the institution the next day.

35. Upon my initial appointment to the MCC, I found the sanitation conditions to be horrendous—the worst I had ever witnessed at any prison. The facility was filthy, cluttered, and infested with insects and rodents, among other serious concerns. Having worked in eight federal prisons and inspected numerous others while assigned to three regional offices, I have observed that unsanitary conditions significantly impact inmate behavior and contribute to a chaotic and, at times, unsafe environment.

36. Within the year of my arrival, the MCC was scheduled for inspection by the American Correctional Association (ACA). During that period, the BOP contracted with ACA to review and inspect each federal prison every three years for initial accreditation or reaccreditation. My staff and I worked tirelessly for months to elevate the sanitation standards above the substandard level. The MCC was reaccredited by ACA that year. Unfortunately, after my departure, the sanitation levels plummeted back to their previous substandard state due to leadership instability and a lack of prioritization of sanitation by subsequent wardens.

37. On August 10, 2019, Jeffrey Epstein's suicide brought intense scrutiny to the MCC. The media coverage was extensive, and then-Attorney General William Barr called for an investigation by the FBI and the Justice Department's inspector general. AG Barr publicly expressed his anger, citing 'serious irregularities' and stating that the MCC failed to 'adequately secure this prisoner.' Shortly after Epstein's suicide, acting BOP Director Hugh Hurwitz was removed and reassigned by AG Barr, MCC Warden

Lamine N'Diaye was reassigned to the BOP's Northeast Regional Office, and two

corrections officers were criminally charged with falsifying government documents.

These charges followed allegations that they failed to make mandated rounds in the

Special Housing Unit (SHU) where Epstein was housed and lied on the official

logbooks.

https://www.npr.org/2019/08/12/750492186/serious-irregularities-at-jail-where-

epstein-died-attorney-general-says#:~:text=Climate-

,Epstein%20Death:%20Attorney%20General%20Says%20There%20Were%20'Serio

us%20Irregularities',to%20%22adequately%20secure%22%20him.[2]

https://www.cbsnews.com/news/jeffrey-epstein-death-william-barr-reassigns-bureau-

of-prisons-jeffrey-epstein-suicide-today-2019-08-19/[3]

38.     In June 2023, following an investigation into Jeffrey Epstein's suicide, OIG released

the report titled "Investigation and Review of the Federal BOP's Custody, Care, and

Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York,

New York." The OIG investigation identified "numerous and serious failures by

MCC New York staff, including multiple violations of MCC New York and BOP

policies and procedures." The OIG reiterated that they had repeatedly identified

systemic operational challenges in federal prisons that adversely affected the

Agency's ability to operate safe and secure facilities. The investigation and inspection

---

[2] NPR. "'Serious Irregularities' at Jail Where Epstein Died, Attorney General Says." *NPR*, August 12, 2019.
https://www.npr.org/2019/08/12/750492186/serious-irregularities-at-jail-where-epstein-died-attorney-general-says.
[3] CBS News. "Jeffrey Epstein Death: William Barr Reassigns BOP Chief." *CBS News*, August 19, 2019.
https://www.cbsnews.com/news/jeffrey-epstein-death-william-barr-reassigns-bureau-of-prisons-jeffrey-epstein-
suicide-today-2019-08-19/.

of the MCC revealed several of these same systemic issues, including the management of at-risk suicidal inmates, staffing shortages, management failures, widespread disregard for procedures, policies, and protocols, and malfunctioning and inoperable security camera systems.

https://oig.justice.gov/sites/default/files/reports/23-085.pdf[4]

39. In March 2020, less than a year following the suicide of Epstein, MCC New York experienced an extended lockdown lasting more than a week to allow officials to conduct an extensive and exhaustive search of the facility after receiving a tip that a firearm had been smuggled into the prison.  The search led authorities to find a loaded gun in an inmate's cell.  In addition to the discovery of the firearm, officials recovered additional contraband, including cell phones, narcotics, and homemade weapons.  https://www.nbcnewyork.com/investigations/lawyers-furious-as-mcc-lockdown-enters-day-8-probe-for-alleged-smuggled-gun-continues/2314203/#:~:text=By%20Jonathan%20Dienst%20•%20Published,2020%20at%2010:49%20pm&text=NBC%20Universal%2C%20Inc.,weapon%20had%20been%20smuggled%20inside.[5]

40. In May 2020, as the COVID-19 pandemic rapidly spread across the world and through prisons, inmates at MCC New York alleged they were not receiving necessary treatment or proper medical care. Although the number of positive COVID-

---

[4] U.S. Department of Justice, Office of the Inspector General. *Report of Investigation: The Federal BOP' Handling of the Custody, Care, and Supervision of Jeffrey Epstein.* Report No. 23-085, June 2023. https://oig.justice.gov/sites/default/files/reports/23-085.pdf.

[5] Dienst, Jonathan. "Lawyers Furious as MCC Lockdown Enters Day 8; Probe for Alleged Smuggled Gun Continues." *NBC New York*, February 20, 2020. https://www.nbcnewyork.com/investigations/lawyers-furious-as-mcc-lockdown-enters-day-8-probe-for-alleged-smuggled-gun-continues/2314203/.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

19 cases was reported as minimal, it was suspected that this low number was due to inconsistent regular testing. In response to a proposed class action lawsuit filed on behalf of MCC inmates, U.S. District Court Judge Edgardo Ramos granted the inmates' attorneys and their medical expert, Dr. Homer Venters, permission to inspect the prison conditions. Dr. Venters had recently conducted a similar inspection at MDC Brooklyn.

41.    Following his inspection, Dr. Homer Venters provided a declaration outlining his findings related to MCC's response to the COVID-19 pandemic. The deficiencies were numerous and varied. Dr. Venters concluded that MCC had inadequate detection and response measures, insufficient infection control protocols to curb the spread of the virus, and inadequate identification and protection for high-risk inmates from serious illness or death. He cited several reasons for these shortcomings, including grossly inadequate sick call systems, deficient virus screening and contact tracing procedures, lack of proper cleaning supplies, and flaws in the prison's isolation and quarantine protocols. Dr. Venters noted that across many measures, the institution had failed to implement CDC guidelines. Many of the same deficiencies identified at the MCC were also found during Dr. Venters' inspection of MDC Brooklyn one month earlier, with the MDC inspection revealing even worse conditions.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/dr._
venters_mcc_report.pdf[6]

https://www.documentcloud.org/documents/6880808-Dr-Homer-Venters-Report-
From-Tour-of-MDC-Federal/[7]

42.     In a press release issued on November 4, 2021, the U.S. Attorney's Office for the

        Southern District of New York announced the indictment of current and former

        (MCC) employees and inmates for bribery, contraband smuggling, narcotics

        distribution, and obstruction of justice offenses. Three current or former MCC staff

        members and eight former MCC inmates were charged with a contraband smuggling

        conspiracy and obstruction of justice. The contraband items included cell phones,

        narcotics, tobacco, and alcohol. One of the inmates charged was allegedly a high-

        ranking member of the violent Nine Trey Gangsters, a subset of the Bloods street

        gang. Such criminal behavior by staff exacerbates the danger in an already unsafe and

        hazardous environment.  https://www.justice.gov/usao-sdny/pr/current-and-former-
        metropolitan-correctional-center-employees-and-inmates-indicted[8]

43.     In 2021, then-Deputy Attorney General (DAG) Lisa O. Monaco toured the troubled

        MCC to witness firsthand the prison's operations. The facility had long faced

        criticisms from lawyers, judges, and inmates, citing various concerns, including

---

[6] Venters, Homer. *Report on Conditions at MCC New York.* Federal Public Defender, [n.d.].
https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/dr._venters_mcc_report.pdf.
[7] Venters, Homer. *Report from Tour of MDC Federal Facility.* DocumentCloud, 2020.
https://www.documentcloud.org/documents/6880808-Dr-Homer-Venters-Report-From-Tour-of-MDC-Federal.
[8] U.S. Attorney's Office, Southern District of New York. "Current and Former  Employees and Inmates Indicted."
*U.S. Department of Justice*, February 7, 2023. https://www.justice.gov/usao-sdny/pr/current-and-former-
metropolitan-correctional-center-employees-and-inmates-indicted.

horrid conditions and allegations of corrupt corrections officers. Weeks after DAG

Monaco's visit, the Department of Justice announced that the MCC would

temporarily close to allow BOP officials to thoroughly assess the issues, formulate

plans to improve conditions, and swiftly resolve problems.

https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-

closed.html?searchResultPosition=10[9]

44.     In March 2022, one year after DAG Monaco's visit, the OIG conducted a physical

inspection of the MCC. By this time, all inmates had been transferred out to other

prisons, most transferred to MDC Brooklyn and a small number to other prisons.

Many staff also transferred to the MDC.  The OIG identified numerous needed

infrastructure improvements and life safety projects, including fire alarms and fire

protection systems, elevators, roofing, door replacements, and an abundance of other

issues.  Numerous photos of the areas in need of repair were provided by OIG and

repairs and improvements were estimated to be over $115 million.  In an update on

OIG website in March 2023 indicated the estimated costs for repairs at MCC New

York increased to $230 million following further review.  An April 2023 update on

the website advised, "the future of MCC New York is unknown, as the BOP has not

secured adequate funds to complete all the necessary repairs."

https://oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-

institutions/MCC-New-York[10]

---

[9] Weiser, Benjamin. "Jail Where Jeffrey Epstein Died to Close, at Least Temporarily." *The New York Times*, August 26, 2021. https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html.
[10] U.S. Department of Justice, Office of the Inspector General. *Federal BOP' Efforts to Maintain and Construct Institutions: MCC New York.* [n.d.]. https://oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions/MCC-New-York.

45.     In summary, my tenure as Warden at MCC New York provided valuable insights into the systemic challenges faced by federal correctional facilities, including MDC Brooklyn. The issues of infrastructure, staffing shortages, sanitation, and leadership instability are not unique to MCC but are also prevalent at MDC. These persistent problems have contributed to the deteriorating conditions at MDC Brooklyn, highlighting the urgent need for comprehensive reform to ensure the safety and well-being of both staff and inmates. The lessons learned from MCC New York underscore the importance of addressing these challenges proactively to prevent further decline and improve the overall functioning of MDC Brooklyn.

### RECENT CONCERNING EVENTS AND INCREASED VIOLENCE AT

### MDC BROOKLYN

46.     The MDC Brooklyn has faced numerous challenges in recent years, including increased violence, contraband smuggling, staff corruption, and severe staffing shortages. These issues have led to a series of concerning events that have significantly impacted the safety and security of the facility. Despite efforts to address these problems, such as forming an Urgent Action Team and implementing staff recruitment and retention incentives, MDC Brooklyn continues to struggle with systemic operational challenges. This section will provide examples of these concerning events, discuss contributing factors, and outline responses to address these issues to ensure the well-being of staff and inmates.

47.     On February 26, 2025, BOP Assistant Deputy Director (ADD) Kathleen Toomey

testified at the Oversight of the Federal BOP hearing before the United States House

Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies.

ADD Toomey also provided a written Statement to coincide with the hearing.  In her

written statement and during the hearing, ADD Toomey explained that in 2024, the

BOP implemented monetary incentives for staff recruitment and retention to address

the staffing crisis.  The incentives assisted with addressing staffing shortages, and

MDC Brooklyn, whose staff were receiving a 35% retention incentive was

specifically mentioned in ADD Toomey's Statement.  However, ADD Toomey

reported that due to budget constraints, many of these incentives would be impacted

and some would be eliminated entirely.

48.     ADD Toomey discussed the positive impact the incentives offered at MDC Brooklyn,

highlighting how they aided in the recruitment and retention of staff.  In a letter dated

March 21, 2025, addressed to Attorney General Pam Bondi, numerous United States

Senators expressed deep concern regarding the BOP's plan to reduce or eliminate

employee retention incentives.  MDC Brooklyn was one of many institutions

mentioned in the letter as being affected by the reduction or elimination of retention

incentives.

49.     This retention elimination and reduction will likely hinder MDC Brooklyn's ability to

retain current employees and recruit new corrections professionals, further

exacerbating the staffing shortage at the facility and increasing the risk to staff and

inmate safety.  Brandy Moore-White, BOP's National Union President, described

how the curtailing and canceling of retention pay incentives will negatively impact

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

the existing staffing shortage. In a February 26, 2025, article by Government Executive, Ms. Moore-White expressed her concern that the elimination of these retention incentives could have profound impacts on the agency's ability to meet its mission, referring to it as an "abrupt cleaving of the benefit."

https://www.govexec.com/pay-benefits/2025/02/23000-federal-prison-workers-are-set-take-pay-cuts-25-next-month/403312/?oref=ge-featured-river-top[11]

50.    As a result of the increased violence, contraband smuggling, corrupt staff, staff shortages, and a variety of other concerns over the last few years, former BOP Director Colette Peters initiated an Urgent Action Team to address the ongoing and well-publicized problems at MDC Brooklyn.  This is the first time I have ever seen an Urgent Action Team formed to target a specific federal prison. This speaks volumes about the level of dysfunction at MDC Brooklyn, and I have never experienced or heard of corrective action of this magnitude to address a single prison.  Although a report issued by the BOP in September 2024 indicated progress had been made, problems at MDC Brooklyn persisted despite the added attention and efforts of the Urgent Action Team, as evidenced by media articles, official reports, and U.S. Attorney's Office press releases.

51.    An Associated Press report stated that the BOP "increased staffing at the MDC by about 20%, bringing the total number of employees to 469."  There still remained 157 vacant positions. The new hires include correctional officers and medical staff.

---

[11] Wagner, Erich. "23,000 Federal Prison Workers Are Set to Take Pay Cuts of up to 25% Next Month." *Government Executive*, February 2025. https://www.govexec.com/pay-benefits/2025/02/23000-federal-prison-workers-are-set-take-pay-cuts-25-next-month/403312/.

"Before the surge, the facility was operating at about 55% of full staffing, according to court filings." Despite the added attention and the efforts of the Urgent Action Team, there continue to be news stories about the problems at MDC Brooklyn.

https://apnews.com/article/sean-diddy-combs-federal-prisons-brooklyn-jail-0c24b4a6559d147be9a0206653369d65[12]

52.    Challenges associated with medical care as it relates to staffing shortages have been a concern across the BOP, including MDC. In her written Statement and subsequent testimony at the February 2025 Subcommittee hearing, ADD Toomey, addressed how staffing shortages are affecting medical care within federal prisons. In her Statement to Congress, ADD Toomey stated, "Hiring and retention of health care professionals also remains a significant challenge. Staffing shortages directly affect the ability of inmates to receive medical care, including timely treatment."

https://www.congress.gov/119/meeting/house/117920/witnesses/HHRG-119-AP19-Wstate-ToomeyK-20250226.pdf[13]

53.    A March 6, 2025, press release from the United States Attorney's Office (USAO) Eastern District of New York summarizes numerous criminal cases that originated within MDC Brooklyn. The heading of the USAO's press release was "25 MDC Inmates, Their Associates and a Former Correctional Officer — Charged in a Dozen Criminal Cases at the Federal Jail in Brooklyn." The 25 defendants were charged in

---

[12] Balsamo, Michael, and Michael R. Sisak. "BOP Says It's Adding Staff and Making Fixes at Jail Where Sean 'Diddy' Combs Is Held." *AP News*, March 30, 2025. https://apnews.com/article/sean-diddy-combs-federal-prisons-brooklyn-jail-0c24b4a6559d147be9a0206653369d65.

[13] Toomey, Senator Pat. "Testimony of Senator Pat Toomey." *House Committee on Appropriations*, February 26, 2025. https://www.congress.gov/119/meeting/house/117920/witnesses/HHRG-119-AP19-Wstate-ToomeyK-20250226.pdf.

12 separate cases, all related to violence and contraband smuggling. Contraband smuggling operations included items such as cellphones, ceramic scalpels, drugs, and other contraband. Multiple inmates were charged with violent assaults against fellow inmates, and one person was charged with continuing to commit fraud.

https://www.justice.gov/usao-edny/pr/25-metropolitan-detention-center-inmates-their-associates-and-former-correctional[14]

54.    The Associated Press (AP) also reported on some of the same criminal activity as reported in the March 6 press release from the USAO; however, they provided additional details. The AP reported how violent incidents at MDC Brooklyn, most recently resulting in the arrest of twenty-three inmates who were charged with crimes ranging from smuggling weapons in a Doritos bag to the stabbing in February 2025 of a man convicted in the killing of hip-hop legend Jam Master Jay. Fifteen of the inmates charged were accused of six separate stabbings, slashings, or beatings. Six were charged in a February 22, 2025, disturbance that injured multiple inmates. At least nine other inmates had wounds consistent with being stabbed or slashed, and five were hospitalized, according to prosecutors. As a result, MDC Brooklyn suspended friends and family visits for all inmates.

https://apnews.com/article/federal-jail-brooklyn-inmates-charged-d9201a239ac59193e8db2e343b469738[15]

---

[14] U.S. Attorney's Office, Eastern District of New York. "25 MDC Inmates, Their Associates, and a Former Correctional Officer — Charged in a Dozen Criminal Cases at the Federal Jail in Brooklyn." *U.S. Department of Justice*, March 6, 2025. https://www.justice.gov/usao-edny/pr/25-metropolitan-detention-center-inmates-their-associates-and-former-correctional.

[15] Sisak, Michael. "23 Brooklyn Inmates Charged After Rash of Violence, Including Stabbing of Jam Master Jay's Killer." *AP News*, March 26, 2025. https://apnews.com/article/federal-jail-brooklyn-inmates-charged-d9201a239ac59193e8db2e343b469738.

55.     On October 28, 2024, in response to ongoing concerns about violence, drugs, contraband, and other issues, the BOP, in cooperation with OIG, conducted a multi-agency operation at MDC Brooklyn. Multiple officers and agents from various Justice Department agencies, along with personnel from New York state and local law enforcement, participated in this operation to detect and remove contraband. The raid lasted several days and resulted in the discovery of drugs and drug paraphernalia, homemade weapons, and electronic devices. This "multi-agency operation" is a clear indicator of how out of control and dysfunctional the Brooklyn prison is. Institution shakedowns are typically conducted using institution staff, not a bevy of personnel from multiple agencies, except for occasionally a K-9 unit from a local police department.  Throughout my career with the Agency and in the years since retirement, I have never witnessed an operation of this magnitude at any federal prison.  https://www.bop.gov/news/pdfs/20241101-press-release.pdf[16]

56.     On September 30, 2024, OIG published the "Audit of the Federal BOP' Management of the National Gang Unit". This audit directly impacts facilities like MDC Brooklyn, which houses disruptive group members, gang members, and associates from various gangs. Placing rival gang factions in the same housing unit, or even within the same prison, can lead to serious assaults and fatalities.

57.     The OIG found deficiencies and flaws in the Agency's reassessments of security threat groups (STG), including poor documentation and inconsistent application of

---

[16] Federal Bureau of Prisons. *Bureau of Prisons Announces Updates to Good Conduct Time Release Practices*. Washington, D.C.: Federal Bureau of Prisons, November 1, 2024. https://www.bop.gov/news/pdfs/20241101-press-release.pdf.

criteria. STG assignments encompass a broader population of gangs. In major metropolitan areas with federal detention centers, such as New York City, Los Angeles, and Chicago, there are many different STGs and numerous inmates with those assignments.

58.     Additionally, the BOP faced challenges in validating gang affiliations of inmates and communicating the process of denouncing gang ties to inmates. Most relevant to MDC Brooklyn, the OIG identified needed improvements in intelligence gathering and information sharing.

## THE ESCALATION OF ILLEGAL SUBSTANCES IN FEDERAL PRISONS, INCLUDING MDC BROOKLYN

59.     Illegal substances, including K2, other synthetic drugs, and alcohol are present in most, if not all, federal prisons, and MDC Brooklyn is no exception, as indicated in Office of Inspector General inspections dating as far back as January 2003 and other recent official reports as cited in this declaration.

https://oig.justice.gov/reports/BOP/e0302/final.pdf[17]

60.     The prevalence of drugs is evidenced by inmate positive drug tests, overdoses, incident reports for possession of narcotics or alcohol, narcotics discoveries during institution shakedowns, and criminal prosecutions against inmates, visitors, and staff involving illegal drugs and other contraband.  As highlighted in this report, there are

---

[17] U.S. Department of Justice, Office of the Inspector General. *The Federal Bureau of Prisons' Perimeter Security and Control of Contraband at Selected Institutions*. Washington, D.C.: U.S. Department of Justice, February 2003. https://oig.justice.gov/reports/BOP/e0302/final.pdf.

cases of staff smuggling contraband, including drugs into MDC and other official investigations which resulted in the detection of drugs and drug paraphernalia at the Brooklyn prison.

61.     During my tenure at MCC New York, K2/Spice and other drugs were prevalent within the institution, and despite my efforts and the efforts of other employees to stop them from coming in, it was a never-ending battle.  MDC Brooklyn and other federal prisons appear to struggle with the same concerns.

62.     Although Mr. Saenz has no history of using illegal substances, and despite being surrounded by drugs and likely witnessing others engage in drug use at MDC, he has never tested positive for any illegal substances. However, Mr. Saenz did receive an incident report for possessing drugs on June 27, 2023. This incident involved Mr. Saenz passing an envelope containing K2, a synthetic marijuana, from one inmate to another. He was sanctioned for this disciplinary infraction.

63.     Sadly, on August 12, 2024, a BOP Mailroom Supervisor at USP Atwater, California, lost his life after opening a piece of inmate mail that had been soaked in fentanyl. Three individuals, including an Atwater inmate, were charged in connection with the Mailroom Supervisor's death. https://www.justice.gov/usao-edca/pr/three-charged-conspiracy-distribute-narcotics-prison-following-death-usp-atwater-staff[18]

---

[18] U.S. Attorney's Office, Eastern District of California. "Three Charged with Conspiracy to Distribute Narcotics in Prison Following the Death of USP Atwater Staff." *United States Department of Justice*, August 20, 2024. https://www.justice.gov/usao-edca/pr/three-charged-conspiracy-distribute-narcotics-prison-following-death-usp-atwater-staff.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

64.     On April 21, 2025, 17 officers at FCI Thomson, Illinois, were exposed to an unknown
        substance in the mail room, resulting in all being taken to the hospital and most being
        treated on the scene with Narcan. This incident has caught the attention of Congress,
        leading to the proposal of a bill aimed at addressing the issue. If passed, the bill
        would require the BOP to transition to digital mail scanning and implement other
        procedures to reduce the risk of substance exposure for staff who process the mail.
        https://www.wwnytv.com/2025/04/21/17-officers-taken-hospital-after-being-
        exposed-unknown-substance-federal-prison/[19]
        https://bacon.house.gov/news/documentsingle.aspx?DocumentID=2605#:~:text=and
        %20prison%20employees.-,H.R.,the%20mail%2C"%20said%20Rep.[20]

65.     During my tenure at MCC New York, K2/Spice and other drugs were prevalent
        within the institution, and despite my efforts and the efforts of other employees to
        stop them from coming in, it was a never-ending battle. At MDC Brooklyn, as in
        most federal prisons, drugs and homemade intoxicants are readily available to the
        inmate population. Based on accounts from official reports, indictments of MDC
        staff, and media reports, drugs are a pervasive concern at MDC Brooklyn. Given this
        environment, it is likely that Mr. Saenz has witnessed others in his housing unit using
        drugs; however, notably, he has chosen not to engage in any use of illegal substances.

---

[19] KWQC Staff and Amanda Alvarado. "17 Officers Taken to Hospital after Being Exposed to Unknown Substance
at Federal Prison." *WWNY-TV*, April 21, 2025. https://www.wwnytv.com/2025/04/21/17-officers-taken-hospital-
after-being-exposed-unknown-substance-federal-prison/.
[20] Bacon, Don. "Rep. Bacon Introduces Bipartisan Bill to Protect Corrections Officers and Inmates from Drug
Exposure." *U.S. Congressman Don Bacon*, April 10, 2024.
https://bacon.house.gov/news/documentsingle.aspx?DocumentID=2605.

**STAFF CORRUPTION AND EMPLOYEE MISCONDUCT AT MDC**

**BROOKLYN CONTRIBUTES TO AN UNSAFE AND DANGEROUS**

**ENVIRONMENT**

66.     Corruption among staff in federal prisons creates an unsafe environment for both their coworkers and inmates.  During my tenure as warden at three federal prisons, I had the unfortunate experience of managing and confronting what we referred to as "dirty staff."  While corrupt staff have always been present, in recent years, we are hearing about these criminal actions by staff at federal prisons nationwide more frequently than ever before. There are countless incidences of staff corruption in federal prisons throughout the country, and MDC Brooklyn is no exception.  Many of the staff members whose criminal actions are discovered are being criminally prosecuted, which will hopefully deter others from committing similar offenses.

67.     Staff misconduct and criminal cases originating from MDC Brooklyn appear to have increased significantly in recent years, or perhaps they are being reported more frequently in the news than in the past. Those of us who took our jobs seriously found the actions of corrupt staff to be abhorrent, as they prioritize their own self-interests over the safety of their fellow employees, thereby making the prison environment even more dangerous than it inherently is.

68.     The following examples are only a small sampling of a larger picture of what is happening inside MDC Brooklyn and only account for those corrupt staff who have been caught. Unfortunately, not all corrupt staff are caught, which only serves to perpetuate the violence and unsafe conditions in federal prisons like, MDC Brooklyn.

69.     MDC Brooklyn corrections officer, Leon Wilson, was arrested in September 2024

and charged with willfully depriving an individual of his constitutional rights while

acting under color of law.  Mr. Wilson was involved in a shooting incident while on

duty at MDC.  The USAO, Eastern District of New York reported that while on patrol

in a BOP-issued vehicle, carrying a BOP-issued firearm, he chased a civilian vehicle

from the institution parking lot, and gave chase through parts of Brooklyn.  At one

point, he fired three shots towards the other vehicle; one of those shots struck one of

the occupants.   According to an OIG report, Mr. Wilson was indicted on November

14, 2024, one count of discharging a firearm during a crime of violence and one count

of deprivation of rights under color of law.

 https://www.justice.gov/usao-edny/pr/mdc-correctional-officer-charged-federal-civil-rights-violation[21]

https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-discharging-firearm-crime-violence-and[22]

70.     In January 2025, former corrections officer, Najee Jackson, was formally criminally

charged with attempting to smuggle contraband into the MDC Brooklyn.  The

smuggling plot was uncovered when Jackson placed various personal belongings into

a bin on the conveyor belt to enter work at MDC Brooklyn, and then walked through

the metal detector, triggering the alarm. After making several failed attempts to clear

---

[21] U.S. Attorney's Office, Eastern District of New York. "MDC Correctional Officer Charged with Federal Civil Rights Violation." *U.S. Department of Justice*, March 28, 2025. https://www.justice.gov/usao-edny/pr/mdc-correctional-officer-charged-federal-civil-rights-violation.
[22] Office of the Inspector General, U.S. Department of Justice. "BOP Correctional Officer Indicted for Discharging Firearm in Crime of Violence." *U.S. Department of Justice*, March 28, 2025. https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-discharging-firearm-crime-violence-and.

the metal detector, Jackson removed his BOP-issued protective vest, which was found to contain vacuumsealed bags of marijuana, cigarettes, two lighters and rolling papers. Two days later, Jackson resigned from the BOP.

https://www.justice.gov/usao-edny/pr/former-federal-correctional-officer-charged-attempting-smuggle-contraband-metropolitan[23]

71. On July 30, 2024, a former MDC Brooklyn corrections officer received a 30-month prison sentence after pleading guilty to accepting bribes. The officer, who communicated with inmates via contraband cell phones, was paid tens of thousands of dollars for his role in smuggling drugs, cell phones, and other contraband into the prison. https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-sentenced-prison-accepting-bribes-exchange-smuggling[24]

72. On August 24, 2024, a former MDC corrections officer pleaded guilty for her role in smuggling cell phone chargers into the MDC Brooklyn. Five months later, in January 2025, she was sentenced in the Eastern District of New York to 12 months' probation. The U.S. Attorney's Office for the Eastern District of New York stated, "Contraband, including cell phones in prisons, can be very dangerous." Cell phones enable inmates to continue criminal activities both inside and outside the prison. Two months after the arrest of the MDC officer who smuggled cell phone chargers, an MDC Brooklyn

---

[23] U.S. Attorney's Office, Eastern District of New York. "Former Federal Correctional Officer Charged with Attempting to Smuggle Contraband into MDC in Brooklyn." *U.S. Department of Justice*, January 29, 2025. https://www.justice.gov/usao-edny/pr/former-federal-correctional-officer-charged-attempting-smuggle-contraband-metropolitan.

[24] U.S. Attorney's Office, Eastern District of New York. "Former Federal Correction Officer Sentenced to Prison for Accepting Bribes in Exchange for Smuggling Contraband into the MDC in Brooklyn." *U.S. Department of Justice*, July 30, 2024. https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-sentenced-prison-accepting-bribes-exchange-smuggling.

inmate was charged with orchestrating a murder-for-hire from within the prison using a contraband cell phone.

https://oig.justice.gov/news/press-release/former-bop-correctional-officer-sentenced-providing-contraband-prison#:~:text=On%20January%2031%2C%202025%2C%20a,Eastern%20District%20of%20New%20York.[25]

https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-pleads-guilty-smuggling-contraband-metropolitan[26]

https://www.secretservice.gov/newsroom/releases/2024/10/federal-inmate-mdc-brooklyn-charged-orchestrating-murder-hire-using[27]

73.     On March 20, 2023, a former MDC corrections officer pleaded guilty to receiving bribes. The officer was charged with smuggling contraband cell phones and was also suspected of bringing in drugs. Although the officer could not be directly linked to the drugs, a strong odor of marijuana was detected emanating from the cell of the inmate who received one of the cell phones. Authorities later found nine ounces of

---

[25] Office of the Inspector General, U.S. Department of Justice. "Former BOP Correctional Officer Sentenced for Providing Contraband to Prison." *U.S. Department of Justice*, January 31, 2025. https://oig.justice.gov/news/press-release/former-bop-correctional-officer-sentenced-providing-contraband-prison#:~:text=On%20January%2031%2C%202025%2C%20a,Eastern%20District%20of%20New%20York.
[26] U.S. Attorney's Office, Eastern District of New York. "Former Federal Correction Officer Pleads Guilty to Smuggling Contraband into the MDC." *U.S. Department of Justice*, February 15, 2025. https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-pleads-guilty-smuggling-contraband-metropolitan.
[27] U.S. Secret Service. "Federal Inmate at MDC Brooklyn Charged with Orchestrating Murder-for-Hire Using Contraband Cellphone." *U.S. Secret Service*, October 2, 2024. https://www.secretservice.gov/newsroom/releases/2024/10/federal-inmate-mdc-brooklyn-charged-orchestrating-murder-hire-using.

marijuana in the housing unit bathroom where the officer was allegedly leaving the contraband for inmates. https://www.justice.gov/usao-edny/pr/ex-federal-correction-officer-pleads-guilty-taking-bribes-exchange-smuggling[28]

74.    MDC Brooklyn was also in the news after the BOP received word that a gun was inside the prison.  As previously discussed in this report, this similar situation occurred at the MCC New York shortly before its closing.  The incident at MDC occurred in October 2021.  The BOP would not confirm a firearm was found, but did confirm a search was underway following the tip the Agency received.  One media source reported that a gun was found on the 6th floor of the prison. https://www.nydailynews.com/2021/10/15/feds-launched-emergency-search-for-gun-at-brooklyn-federal-jail/[29]

75.    Within the last eight years, multiple MDC corrections officers and lieutenants were indicted and subsequently convicted after a lengthy investigation involving sexual assaults against female detainees at the Brooklyn prison.  Over the course of several years, numerous victims were repeatedly raped, sexually assaulted, and threatened with retaliation if they spoke of the abuse.  https://www.justice.gov/usao-

---

[28] U.S. Attorney's Office, Eastern District of New York. "Ex-Federal Correction Officer Pleads Guilty to Taking Bribes in Exchange for Smuggling Contraband into the MDC in Brooklyn." *U.S. Department of Justice*, March 20, 2023. https://www.justice.gov/usao-edny/pr/ex-federal-correction-officer-pleads-guilty-taking-bribes-exchange-smuggling.
[29] Goldberg, Noah. "Feds Launch Emergency Search for Gun at Brooklyn Federal Jail." *New York Daily News*, October 15, 2021. https://www.nydailynews.com/2021/10/15/feds-launched-emergency-search-for-gun-at-brooklyn-federal-jail/.

edny/pr/three-federal-correctional-officers-charged-sexually-abusing-female-inmates[30]

https://www.justice.gov/usao-edny/pr/federal-correctional-officer-convicted-repeatedly-raping-female-inmate[31]

### RECENT EASTERN AND SOUTHERN DISTRICT OF NEW YORK COURT CASES AFFECTING DEFENDANTS INCARCERATED AT MDC BROOKLYN INCLUDING THOSE FROM THE HONORABLE GARY R. BROWN

76.     In recent years, the violence, lack of medical care, understaffing, and other concerns regarding the MDC Brooklyn facility have increasingly influenced the decisions of U.S. District Court Judges from the Eastern and Southern Districts of New York. Many of these informed judges have detailed in their decisions how the conditions at MDC directly impacted their rulings in various cases.

77.     In January 2019, MDC Brooklyn made headlines after an electrical fire at the institution resulted in the loss of heat, hot water, and power.  This occurred during a time when outside temperatures were in the single digits.  The incident led to a lockdown of the facility, all visiting was canceled, including legal visits for a period. The Office of the Inspector General issued a report of the incident.  In their report OIG noted "the BOP failed to adequately address preexisting heating and cooling at

---

[30] U.S. Attorney's Office, Eastern District of New York. "Three Federal Correctional Officers Charged with Sexually Abusing Female Inmates." *U.S. Department of Justice*, February 25, 2025. https://www.justice.gov/usao-edny/pr/three-federal-correctional-officers-charged-sexually-abusing-female-inmates.
[31] U.S. Attorney's Office, Eastern District of New York. "Federal Correctional Officer Convicted of Repeatedly Raping Female Inmate." *U.S. Department of Justice*, March 15, 2025. https://www.justice.gov/usao-edny/pr/federal-correctional-officer-convicted-repeatedly-raping-female-inmate.

MDC Brooklyn." OIG also determined that some inmate medical conditions went untreated or were improperly addressed during the power outage, BOP officials did not provide timely or proper communication with stakeholders.

https://oig.justice.gov/reports/2019/e1904.pdf[32]

78.     In response to this incident, lawsuits were filed citing inhumane conditions and access to counsel through legal visits. U.S. District Judge Edward Korman granted certification to a class action lawsuit, of approximately 1,694 inmates in the case of Scott v. Quay. In August 2023, the BOP agreed to pay $10,936,250 to more than 1600 inmates who were incarcerated at MDC in January and February 2019.

https://www.nytimes.com/2023/08/22/nyregion/nyc-jail-settlement-blackout.html[33]

79.     At the sentencing in the case of *United States of America v. Daniel Colucci*, United States District Judge Gary R. Brown expressed serious concerns regarding MDC Brooklyn. Judge Brown cited multiple cases where other judges hesitated to send defendants to MDC due to the jail's conditions. Describing the situation at MDC, Judge Brown stated, "chaos reigns, along with uncontrolled violence." He further commented, "Allegations of inadequate supervision, unbridled assaults, and lack of sufficient medical care are supported by an increasing body of evidence, with certain instances that are irrefutable." Judge Brown concluded that if the BOP decided to send Defendant Colucci to serve his sentence at MDC Brooklyn, he would vacate the defendant's sentence.

---

[32] Office of the Inspector General, U.S. Department of Justice. "Review of the Federal BOP' Use of Solitary Confinement." *U.S. Department of Justice*, March 2019. https://oig.justice.gov/reports/2019/e1904.pdf.

[33] Zraick, Karen. "NYC Jail Reaches Settlement Over Blackout That Left Inmates Without Phones." *The New York Times*, August 22, 2023. https://www.nytimes.com/2023/08/22/nyregion/nyc-jail-settlement-blackout.html.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

80.      On June 9, 2024, in *United States of America v. Christian Sydney Griffin*, the Honorable Eric Komittee granted a compassionate release motion. Defendant Griffin had been seriously assaulted by other inmates and claimed that the institution was not providing necessary medical care for his injuries, including a fractured eye socket. MDC Brooklyn failed to provide follow-up medical care. In his decision, Judge Komittee noted that "MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates." Judge Komittee also recognized that Defendant Griffin's defense counsel's efforts to visit and communicate with her client following the assault were delayed due to the lockdowns.

     https://casetext.com/case/united-states-v-griffin-2210[34]

81.      On January 4, 2024, United States District Judge Jesse M. Furman, in the Southern District of New York, decided not to incarcerate a defendant at MDC Brooklyn following his guilty plea for a drug charge. In *United States of America v. Gustavo Chavez*, Judge Furman offered harsh criticism regarding the conditions at MDC Brooklyn. The three primary factors that influenced Judge Furman's decision were: "(1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care—a particular risk in this case, and (3) general issues about the conditions at the facility."

82.      In Judge Furman's Opinion and Order, he briefly mentioned the problems that faced the MCC New York, which led to its closure, and compared the problems at MDC

---

[34] *United States v. Griffin*, 22-CR-408 (EK) (E.D.N.Y. June 9, 2024).

Brooklyn. With regards to MDC, Judge Furman cited the 2019 power outage and recognized the severe staffing shortage that has gone on for years. He pointed out the contraband issues as well as some of the complaints of the local union at MDC regarding how the staffing shortages are impacting the safety of the facility. There are times when one officer is responsible for maintaining the security of three housing units and operating on little sleep. In describing conditions, post the power outage and COVID, Judge Furman wrote in his Order, "Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband — from drugs to cell phones — is widespread. At least four inmates have died by suicide in the past three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable."

https://casetext.com/case/united-states-v-chavez-532[35]

83. In another case out of the Eastern District of New York, United States District Judge Brian M. Cogan decided to not impose a prison sentence for Mark Nordlicht, defendant and co-founder of Platinum Partners hedge fund. Judge Cogan indicated, if not for the likelihood the defendant might be required to serve his sentence at MDC Brooklyn, he may have sentenced him to carceral time.

---

[35] *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024)

https://www.law.com/newyorklawjournal/2024/07/16/such-a-weird-case-us-judge-sentences-platinum-partners-co-founder-to-six-months-home-confinement/[36]

84.     These are just a few examples of cases in which judges from the Eastern and

        Southern Districts of New York have expressed frustration regarding the conditions

        of confinement at the former MCC New York and MDC Brooklyn federal prisons.

        Many of the problems at MDC Brooklyn are long-standing and systemic, rather than

        isolated incidents or situations.

85.     As far back as May 2020, following the Epstein suicide and during the COVID-19

        pandemic, the Honorable Richard M. Berman expressed frustration over MCC New

        York's and MDC Brooklyn's handling of the pandemic and the conditions at both

        prisons. Judge Berman was deciding on the appropriate sentence for Terrance

        Morgan, and although the sentencing guidelines recommended up to four years, the

        defendant was sentenced to time served for a bank fraud conspiracy. Defendant

        Morgan had been in pre-trial status at MDC Brooklyn for 15 months.

86.     In his decision, Judge Berman stated, "To my knowledge, there have been no

        forthcoming serious reviews of the living conditions at either the MCC or the MDC,

        which are only many times compounded by this coronavirus that is plaguing the

        country, but in particular, the country's prisons. It is an outrage, I have to say, and

        I'm very disappointed that the Attorney General has not followed through on making

        a thorough investigation of conditions that those of us in the business, as it were, are

---

[36] Saul, Emily. "'Such a Weird Case': U.S. Judge Sentences Platinum Partners Co-Founder to Six Months Home Confinement." *New York Law Journal*, July 16, 2024. https://www.law.com/newyorklawjournal/2024/07/16/such-a-weird-case-us-judge-sentences-platinum-partners-co-founder-to-six-months-home-confinement/.

all too familiar with, and more importantly, has not implemented appropriate changes." When referring to the power outage at the MDC, Judge Berman remarked, "It was just a disaster over there during one of the coldest weeks in the winter. It was so bad that family members and friends were coming to the MDC with blankets so that they could be passed up to their loved ones who were incarcerated. Frankly, it was an unacceptable, beyond unacceptable, condition of an emergency to be sure, but based on a seriously deficient system at core, which I frankly think is still deficient." https://www.nydailynews.com/2020/05/06/judge-on-jeffrey-epstein-case-rips-ag-william-barr-saying-his-failure-to-fix-bureau-of-prisons-is-an-outrage/[37]

### ALEXI SAENZ'S YOUNG AGE AT INITIAL COMMITMENT, MATURITY THROUGH THE YEARS, AND ROLE IN MITIGATING VIOLENCE AT MDC BROOKLYN

87.     Many years ago, while serving as the Assistant Correctional Programs Administrator in the BOP's Northeast Region, I was appointed to a workgroup tasked with researching and drafting the agency's inmate classification policy. For years, the same classification system had been in place with only minor changes, and male and female offenders were classified using identical scoring methods. The classification

---

[37] Brown, Stephen Rex. "Judge on Jeffrey Epstein Case Rips AG William Barr, Saying His Failure to Fix BOP Is an 'Outrage.'" *New York Daily News*, May 6, 2020. https://www.nydailynews.com/2020/05/06/judge-on-jeffrey-epstein-case-rips-ag-william-barr-saying-his-failure-to-fix-bureau-of-prisons-is-an-outrage/.

system needed a significant overhaul to reflect current times and incorporate better inmate classification methods.

88.     The workgroup's commitment spanned several years and resulted in a significantly improved Program Statement 5100.08, Inmate Security Designation and Custody Classification, which is still in use today.

https://www.bop.gov/policy/progstat/5100_008.pdf[38]  Extensive research led to numerous significant changes, including the addition of a section on the age of the offender. Early in the research, the workgroup discovered that an inmate's age played a crucial role in how they should be managed and the types of prisons where they should be housed. We found that younger inmates, aged 24 and under, accounted for a wide variety of incidents, including violent misconduct within federal prisons. Consequently, offenders under the age of 24 were assessed with the highest number of points, totaling 8. The next lowest number of points, 4, were assigned to those aged 25 to 35, while those aged 36 to 54 were assigned 2 points. No points were assessed to offenders over the age of 55.

89.     Mr. Saenz's story is similar to other cases I have worked on as well as what I found during my research while working on the security classification project. It starts with a very young offender who commits serious crimes and awaits his fate, which may result in spending the next decades or possibly the remainder of his life in prison. He enters the BOP at a young age and is thrust into the violent world of MDC Brooklyn.

---

[38] Federal Bureau of Prisons. *Security Designation and Custody Classification Manual*. Washington, D.C.: Federal Bureau of Prisons, September 4, 2019. https://www.bop.gov/policy/progstat/5100_008.pdf.

He must learn to adapt to the unpredictability of an environment filled with gangs, violent offenders, corruption, and other dangerous conditions.

90.     In the process of adapting to a new environment, youthful offenders often accumulate serious incident reports. This behavior can be attributed to the impulsivity of youth, but receiving misconduct violations can also signify a survival mechanism within high or medium security level prisons, or others known for violence, like MDC Brooklyn. Receiving incident reports shows other inmates that you are not weak or afraid and are ready to fight and defend yourself, if necessary, even if it's not true.

91.     While this does not excuse any of the disciplinary infractions Mr. Saenz received during his pretrial commitment, it is important to consider his age and the context of the tumultuous and violent environment at MDC Brooklyn. Mr. Saenz first entered MDC Brooklyn in March 2017.  In the more than eight years he has been incarcerated he received eight incident reports charging 11 violations.  Eight of the 11 violations occurred between 2017 and 2020, most of which Mr. Saenz took accountability for. Given the environment where he has been housed, coupled with his young age at the time, it is not surprising to see the types of violations he was charged with. The more serious violations involved incidents of weapons possession, possession of a hazardous tool, and one infraction for possessing drugs/alcohol. On two occasions, in 2017 and 2020, he was charged with less serious assaults, and in 2020, he was cited for engaging in a group demonstration. The remaining two violations, which were part of the same incident report written in 2018, were for moderate severity offenses of refusing an order and being in an unauthorized area.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

92. Again, while this does not excuse any of Mr. Saenz's violations of prison rules, it is important to note that although he received three incident reports for possessing a weapon, with the last one occurring more than three years ago, he was never charged with brandishing or using a weapon. In prison environments that pose the most danger, inmates often maintain weapons for self-defense and protective purposes rather than for inciting or perpetrating violence. Although I do not condone the possession of weapons, I understand why inmates in dangerous and violent prisons might carry them.

93. Mr. Saenz's initial years were marked by periods of misconduct; however, as he matured over time, he began to undergo significant changes and started moving in a positive direction, as demonstrated by his actions and conduct record over the recent years. When I met with Mr. Saenz during a legal visit with his counsel on October 4, 2024, he described how he has been helpful in mediating conflicts and fostering cooperation among inmates in his unit. During the time Mr. Saenz has been housed at MDC Brooklyn, executives at the facility decided to house MS-13 members together within the same housing unit.

94. Given the violence typically associated with certain gangs, this was a risky and dangerous decision. Placing inmates from the same gang, associates, or aspiring gang members in close proximity to each other creates unnecessary tension and results in significant peer pressure to engage in nefarious group activities when gang members are so closely together every day.

95.  It could have turned out very differently with many violent incidents occurring in that housing unit; however, Mr. Saenz's intentions were not ill-fated. His presence and calm demeanor appear to have contributed to the fact that his housing unit experienced less serious violence and major problems compared to other housing units widely reported in the media at MDC. His calming presence may have been a factor in the reduced violence within his housing unit.

96.  Mr. Saenz appears to have played a significant role in mitigating violence within his housing unit at MDC.  Although a serious assault occurred in his housing unit in April 2024, it is my understanding that Mr. Saenz had no involvement in this incident.  Despite the violence all around him at MDC Brooklyn, Mr. Saenz has managed to not only keep himself above the fray but also through his calm demeanor he is instrumental in keeping the peace amongst inmate peers.  He sets a positive example for others and his efforts have been recognized by staff.

97.  When I met with Mr. Saenz during a legal visit with his counsel on October 4, 2024, he described how he appreciates being helpful and assisting MDC corrections officers with mediating conflicts and fostering cooperation among inmates in his unit.  He sets a positive example for others and his efforts have been recognized by staff.

98.  In December 2021, Mr. Saenz was approved to leave his housing unit to assist with a painting project in the common areas of the institution. Individuals selected for these types of informal job assignments, especially in a pre-trial detention facility like MDC Brooklyn, are typically hand-picked by officers or lieutenants and require a level of trust, as the inmate is allowed untethered access to areas outside of their

housing unit. In addition to the temporary painting detail, Mr. Saenz has a longstanding job assignment as a kitchen worker and has occasionally worked as a unit orderly. Although these work assignments may not seem glamorous, Mr. Saenz appreciates the opportunity to stay busy and receive a small subsidy for his efforts.

99.    Education and other types of classes are not as prevalent within detention centers as they are in more mainline prisons. Despite the very limited programming at MDC, especially during the height of the COVID pandemic in 2020 and 2021 when prison programming often came to a halt, Mr. Saenz signed up for and completed a plethora of classes, including educational, psychology, health education, and art programs.

100.    Mr. Saenz's positive influence for the last several years appears to have created a more stable and controlled environment within his housing unit. His ability to mediate conflicts and foster cooperation among inmates has played a crucial role in reducing incidents of violence. This has not only benefited the inmates within his unit but has also contributed to the overall reduction of violence at MDC Brooklyn.

101.    Additionally, Mr. Saenz's efforts to promote peaceful coexistence and discourage gang-related activities have been recognized by both staff and fellow inmates. His approach to conflict resolution and his commitment to maintaining order have set a positive example for others, demonstrating that it is possible to create a safer and more harmonious environment even within a challenging and volatile setting.

**FINAL ASSESSMENT**

102.    Throughout the last several years of his pre-trial detention at MDC Brooklyn, Alexi
        Saenz has demonstrated significant growth and maturity. Entering prison at the young
        age of 21, he has faced numerous challenges but has shown remarkable resilience and
        a commitment to self-improvement. Despite the tumultuous environment, Mr. Saenz
        has earned the trust of staff and maintained fairly consistent work assignments. He
        has had some periods where he was unassigned to a work detail; however, some of
        this time was during the COVID pandemic, and other times he was assigned to more
        informal work projects, like the painting work he completed. His ability to mediate
        conflicts and foster cooperation among inmates has played a crucial role in reducing
        incidents of violence within his housing unit.

103.    Mr. Saenz's peaceful and calm demeanor has been a contributing factor to lessening
        the violence within his housing unit. His presence has created a more stable and
        controlled environment, benefiting both his fellow inmates and the overall
        atmosphere at MDC Brooklyn. Additionally, Mr. Saenz has taken significant steps to
        ███████████████████████████████████████████████████████
        ███████████████████████████████████████ is a testament to his
        dedication to change and self-improvement.

104.    Despite ████████████████████████████ gang activities, Mr. Saenz's
        maturity and positive influence will serve him well as he navigates the many years of
        incarceration he is facing. ████████████████████████████████
        ███████████████████████████████████████████████████████
        ██████████████████████████████████████████████. His
        efforts to promote peaceful coexistence and discourage gang-related activities have

been recognized by both staff and fellow inmates, setting a positive example for others.

105.    In conclusion, Alexi Saenz's journey at MDC Brooklyn has been marked by significant growth and maturity. His peaceful demeanor, commitment to self-improvement, ████████████████████████████████████████ indicate a promising future in federal prisons. As he continues to navigate his years in prison, his positive influence and dedication to maintaining order will serve him and others well.

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions and the facts underlying them. The facts stated in this declaration are based upon my personal knowledge and experience as an employee of the BOP and any opinions expressed in this Declaration are rendered to a reasonable degree of professional certainty.

Date: 4/28/2025

DocuSigned by:

Maureen Baird

1AA3FC88A75A4BD...

Maureen P. Baird

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

EXHIBIT A

# Maureen Patricia Baird

**618-694-7703 | New Fairfield, CT 06812 | MBaird@expertprisonconsultants.com**

*Professional Profile*

I currently work as a corrections consultant, specializing in Federal Corrections. I have provided Expert Witness testimony in United States District Courts at Sentencing Hearings for defendants who are facing a term of incarceration. As an independent prison consultant, I provide consulting services on all aspects of the Federal Prison System for private attorneys, Federal Defenders Offices, and individuals and family members of those facing a possible federal prison sentence or those who have already been sentenced/incarcerated. I have prepared numerous Declarations for Attorneys within the U.S., and for Barristers/Solicitors in the United Kingdom, working on extradition cases. I have also provided Expert Testimony at Extradition Hearings in the Westminster Magistrates 'Court in the UK regarding conditions of confinement in the BOP. My career in Adult Male/Female Corrections spanned 28 years with the BOP in various capacities, with my final positions as Warden and Senior Executive Service Warden at three Federal Prisons that encompassed a variety of missions and programs. I am an experienced Executive in Correctional Management with a demonstrated history of working in the law enforcement industry.

My experience in Federal Corrections began in 1989 as a case manager with the Department of Justice, Federal BOP. Throughout my 28 years with the Agency, I continued to acquire positions of increasing responsibility. In 2009, I was appointed to the position of Warden at the Federal Correctional Institution, Danbury, Connecticut, and was later promoted to Warden at the  in New York City. There, I was appointed to Senior Executive Staff by the United States Attorney General and within two years, I was transferred to a position of greater responsibility as the Warden of the United States Penitentiary in Marion, Illinois. As warden, I was responsible for the leadership and direction of 300 to 350 staff members and approximately 1200 to 1500 inmates. During my tenure as warden for seven years, I was responsible for staff development and various specialized inmate housing units, including a high security management unit which mainly housed international terrorists who were assigned maximum custody. I led staff through a mission change at the Federal Prison in Danbury, where we had housed female offenders for several years and then transitioned to male offenders in 2013. I was also a member of the Joint Terrorist Task Force, and a member of various other federal, state, and local groups. I was very active with joint training that involved local, state, and federal law enforcement entities. For the last several years I have held Top Secret Clearance, only issued to a small percentage of Wardens and Executive Staff.

**Professional Experience**

Warden                                                     Dec 2015 - Oct 2016
United States Penitentiary - Marion, IL

- CEO of an institution which housed 1500 medium/high security male offenders
- Supervised 350 staff members and a 40-million-dollar budget
- Oversaw the institution and staffing, inmate programs, institution security, staff training, staff and inmate investigations and discipline, policy and procedural changes, community relations, regular training on emergency preparedness
- Provided training to all institution staff during an annual refresher training for six to eight weeks
- Provided training to new hires regarding procedures, rules, and regulations, ethics, and code of conduct requirements and both basic and advanced correctional duties


Warden                                                     *Jun 2014 - Dec 2015*
 - New York City, NY

- CEO of a pre-trial federal prison which employed 350 staff and housed 700 all security level, pre-trial inmates and 150 low security sentenced offenders
- Performed all duties indicated above as warden at USP Marion, Illinois


Warden             *Oct 2009 - Jun 2014*
 Federal Correctional Institution - Danbury, CT

- CEO of an institution which employed 250 staff and housed 1200 female offenders
- Performed all duties indicated above as warden at USP Marion, Illinois, with an added emphasis on training geared toward female offenders


**Correctional Institution Administrator/Associate Warden   *Aug 2007 - Oct 2009***
MDC - San Diego, CA

- Provided direction and leadership to 230 employees
- Assisted in the management of a multi-million-dollar budget
- Oversaw high security/maximum custody pre-trial inmates and 200 low security sentenced inmates
- Ensured all mandatory internal and external security requirements were maintained and properly implemented
- Served on a forward-thinking workgroup focusing solely on future training trends
- Provided training on a regular basis to institution staff as well as other government agency staff
- Implemented several new proactive security measures which resulted in a more open form of

communication between staff and inmates, thus allowing staff to find more contraband and providing a safer environment for staff and inmates

- Worked with union representatives to assist in resolving employee concerns as the Chairperson of the Labor Management Relations Board

**Regional Correctional Programs Administrator**                    *Feb 2005 - Aug 2007*
BOP, Western Regional Office - Dublin, CA

- Oversaw 22 federal prisons located in the Western Region of the United States
- Primarily focused on the development and training of correctional programs staff who were employed by the individual facilities
- Orchestrated on-site training at the institutions, ensured the staff were familiar with policy, provided guidance, and compiled a report following each training
- Assembled a training manual for all new case managers to assist them in their duties
- Conducted regional training with all case management coordinators from the 22 institutions on an annual basis
- Was appointed to various after-action committees to investigate serious incidents that occurred at the prisons within the region
- Acted in the position of Regional Director and Deputy Regional Director multiple times
- Participated in and coordinated several Institution Character Profiles to evaluate programs and review security procedures at various institutions Recommendations were made with regards to enhancing security or reorganizing programs.
- Was involved in the activation of all aspects of newly constructed federal prisons within the Western Region
- Coordinated a four-week online training session for case management coordinators to provide information/training on their new responsibilities through the merging of the Inmate Systems Department falling under their purview
- Received the Supervisor of the Year award from the Regional Director in June 2006

**Correctional Institution Administrator/Executive Assistant**  *Aug 2000 - Feb 2005*
Federal Correctional Institution - Schuylkill, PA

- Planned, supervised, and evaluated programs, training of new staff, and quarterly training of correctional officers
- Was the Chairperson for inmate's initial classifications and program reviews
- Conducted ongoing training and guidance for mentors and proteges as the Mentoring Coordinator

**Assistant Correctional Programs Administrator**                    *Apr 1997 - Aug 2000*
BOP, Northeast Regional Office - Philadelphia, PA

- Committee Member

- Assisted in designing the current Security and Classification System utilized for classifying sentenced female offenders
  - Performed extensive research which suggested a need for a separate classification system for male and female offenders
  - The BOP compiled our findings and in a short time implemented the Committees' suggestions and created a separate Classification System for female offenders, which is still being utilized to date
- Coordinated and conducted annual training programs for all case management coordinators throughout the 23 institutions that comprised the Northeast Region
- Submitted recommendations for policy changes which were adopted and implemented
- Conducted on-site staff assistance visits at various institutions to provide training to staff
- Participated in after-action reviews following significant incidents at institutions within the region

**Case Manager**                                           *Sept 1995 – April 1997*
Federal Correctional Complex – Coleman, FL
- Performed all duties as indicated below during my time as Case Manager at FCI Danbury and FPC Nellis

**Case Management Coordinator**                            *Dec 1992 - Sept 1995*
Federal Correctional Complex - Allenwood, PA
- Served as Victim Witness Coordinator, Central Inmate Monitoring Coordinator, Inmate Performance Pay Coordinator and Public Information Spokesperson for the institution
- Oversaw security with regards to review and approval of inmates designated to the institution
- Wrote lesson plans and provided on-the-job training for new case managers and new counselors
- Provided ongoing training to all case managers, counselors, unit secretaries, and correctional officers regarding correctional programs, procedures, and responsibilities
- Was responsible for quality control of all case management paperwork prior to submission to the warden for signature

**Assistant Parole Liaison Administrator**                 *Oct 1991-Dec 1992*
Mid-Atlantic Regional Office – Annapolis Junction, MD
Duty Station – U.S. Parole Commission – Chevy Chase, MD
- Was responsible for Security Classifications and Designations of parole violators returning to federal prisons

**Case Manager**          *Mar 1989 – Oct 1991*
Federal Correctional Institution - Danbury, CT
Federal Prison Camp – Nellis Air Force Base - Las Vegas, NV
- Oversaw programs related to the 150-200 inmates assigned to my caseload
- Provided training to new case managers

Docusign Envelope ID: 6F8ABE86-B399-4251-A5DA-BA0FAC710FF5

- Conducted inmate classification and program reviews
- Assisted inmates with their release planning
- Provided guidance to inmates
- Conducted security and shakedowns within the institution
- Regularly filled in for correctional officer posts
- Wrote all reports pertaining to inmates on my caseload
- Regulated institution security and housing

**Education**

*Western Connecticut State University - Danbury, CT*

*Bachelor of Science in Justice and Law Administration, May 1988*

- Recipient of Justice and Law Administration Award of 1988