

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

PGS/JLG/MEF            *610 Federal Plaza*
F. #2016R01021           *Central Islip, New York 11722*

May 16, 2025

By ECF
The Honorable Gary R. Brown
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

       Re:     United States v. Alexi Saenz
                 Criminal Docket No. 16-403 (S-8) (GRB)

Dear Judge Brown:

       On July 10, 2024, the defendant Alexi Saenz, also known as "Blasty" and "Plaky," a member of the transnational criminal organization La Mara Salvatrucha, also known as the "MS-13," pleaded guilty to Counts One and Thirty-Eight of the above-captioned Eighth Superseding Indictment (the "Indictment"). Count One charges the defendant with Racketeering, in violation of 18 U.S.C. §§ 1962(c) and 1963, for his participation in the following predicate acts: the January 28, 2016 murder of Michael Johnson; the April 29, 2016 murder of Oscar Acosta; the July 18, 2016 attempted murders of John Doe #1 and John Doe #2; the August 10, 2016 attempted murder of suspected rival gang members; the September 5, 2016 murder of Marcus Bohannon; a September 12, 2016 arson; the September 13, 2016 murders of Kayla Cuevas and Nisa Mickens; the October 10, 2016 murder of Javier Castillo; the October 13, 2016 murder of Dewann Stacks; the January 30, 2017 murder of Esteban Alvarado-Bonilla; and a conspiracy to distribute and possess with intent to distribute cocaine and marijuana, from approximately April 2016 through October 2017. Count Thirty-Eight charges the defendant with Use of a Firearm, which was Brandished and Discharged, During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii). The defendant is scheduled to be sentenced on May 21, 2025.

       According to the Probation Department, the defendant's total offense level as to Count One is 43 and he should be sentenced under Criminal History Category I, which together yield an advisory Guidelines sentence of life in prison. Pre-Sentence Investigation Report ("PSR") at ¶ 238. Additionally, Count Thirty-Eight carries a 120-month sentence, which must run consecutive to the sentence on Count One. Id. While the government concurs with this

calculation, the parties' plea agreement (the "Plea Agreement") provides for a sentencing range of 40 to 70 years' imprisonment, pursuant Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. See Plea Agreement at ¶ 3. At the defendant's guilty plea hearing on July 10, 2024, the Court preliminarily accepted the sentencing range in the Plea Agreement. Thus, provided there has been no change in the Court's position, Court accepts the Plea Agreement, the defendant must be sentenced within the agreed-upon range of 40 to 70 years.

On April 30, 2025, the defendant submitted a sentencing memorandum wherein he requested a sentence of 45 years in prison. ECF Dkt. No. 2746 (Defense Sentencing Memorandum, hereinafter "Def. Mem." at 1). For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in 18 U.S.C. § 3553(a), in particular, the seriousness of the offense, history and characteristics of the defendant, need for deterrence, and need for the sentence to provide a just punishment, the Court should sentence the defendant to a term of 70 years' custody.

## I. Background

The defendant's arrest and conviction resulted from an investigation by the government and Federal Bureau of Investigation's Long Island Gang Task Force (the "Task Force") into a series of violent crimes committed by MS-13 members and associates across Long Island and Queens. As set forth in the PSR and outlined below, the defendant, who was an MS-13 member and the leader of the Sailors Locos Salvatruchas Westside ("Sailors") clique in Brentwood and Central Islip, was the driving force behind a period of unprecedented carnage on Long Island. From January 2016 to January 2017, the Sailors clique, under the defendant's leadership, was responsible for eight murders, numerous attempted murders and an arson, all while selling cocaine and marijuana to finance their relentless pursuit of violence.

### A. January 28, 2016 Murder of Michael Johnson (PSR ¶¶ 34-36)

In late 2015 and early 2016, members of the Sailors clique had a series of discussions about newer members committing acts of violence in order to move up in rank within the gang. Thereafter, on January 28, 2016, the defendant and some of his fellow Sailors clique members spotted Johnson at the Jocorena Deli in Brentwood, New York. The defendant claimed to recognize Johnson and told the other gang members that Johnson was a member of the rival Bloods street gang and he would be their "food," meaning they were going to kill him.[1] The defendant contacted his brother Jairo Saenz, also known as "Funny," ("J. Saenz"), told him that they had identified a rival to kill, instructed J. Saenz to assemble other gang members and get a machete and baseball bat, and arranged to meet J. Saenz in a wooded area off Second Avenue in Brentwood.

The defendant talked to Johnson and invited him to smoke marijuana. He and the other gang members drove Johnson to the prearranged meeting area where they walked

---

[1] The investigation determined that Johnson was not affiliated with any gang and was a completely innocent victim.

2

into the woods, met up with J. Saenz and the other Sailors clique members and began to smoke marijuana. Then, J. Saenz took a baseball bat, which he had hidden, and struck Johnson in the back of the head, without warning. Thereafter, the other gang members began striking Johnson with a machete and stabbing him with a knife. After they killed him, the defendant took a picture of Johnson's body as proof to send gang leaders of their successful mission. As a result of this murder, the defendant was promoted to leader of the Sailors clique.

B. April 29, 2016 Murder of Oscar Acosta (PSR ¶¶ 37-40)

In early 2016, members of the MS-13 had a series of discussions about Oscar Acosta, who had associated with the MS-13 in the past, but had begun associating with the rival 18th Street gang. At one Sailors clique meeting, which was attended by the defendant, Kevin Torres, also known as "Quieto" and "Inquieto" ("Torres"), who was the leader of the Sailors clique for all of New York, J. Saenz and numerous other clique members, the MS-13 members discussed Acosta's 18th Street affiliation, and Torres issued a "green light" for Acosta (authorization to be killed) and directed the Sailors members to kill Acosta if they had the opportunity.

On April 29, 2016, three members of the Sailors clique learned that MS-13 member Jose Pena, from the Normandie Locos Salvatruchas ("Normandie") clique, was planning to meet Acosta to smoke marijuana in a wooded area near an elementary school. The three MS-13 members laid in wait in the woods, and when Acosta arrived, they repeatedly struck him with a tree branch, knocking Acosta unconscious. They bound Acosta's hands and feet with a drawstring and shoelaces and called the defendant, who, a short time later, arrived at the school with two other gang members. J. Saenz then arrived at the scene in a red pickup truck. The defendant directed the others to load Acosta into the trunk of the car in which the defendant had arrived so they could move him to a more isolated area, murder Acosta and bury his body. The two cars then traveled to a wooded area in Brentwood, which was behind some warehouses and adjacent to the grounds of an abandoned psychiatric hospital.

Once they arrived, the MS-13 members carried Acosta, who was not yet dead, into the woods. Except for Pena, who remained on the edge of the woods and kept lookout for the police, the MS-13 members entered the woods. Once in the woods, the MS-13 members who were not yet homeboys—as distinguished from the defendant and J. Saenz, who had already achieved that rank—took turns striking Acosta with a machete. The MS-13 members then placed Acosta in a shallow grave, covered him with dirt, and fled the area.

On May 2, 2016, Acosta's mother reported him missing, but his body was not discovered until September 16, 2016. When Acosta's body was located, it was in a shallow grave, as described above, and his hands and feet were bound.

3

C. July 18, 2016 Attempted Murder of John Doe #1 and John Doe #2 (the "Apple Street Assault") (PSR ¶ 44)

On the evening of July 18, 2016, MS-13 members from the Sailors clique and the Hollywood Locos Salvatruchas ("Hollywood") clique were at the defendant and J. Saenz's house in Central Islip. The defendant directed several of the lower ranking members of the gang to go out looking for rivals to attack and kill so they could earn promotions in the gang. J. Saenz drove two Sailors clique members and one Hollywood clique member to the vicinity of Apple Street in Brentwood, where the MS-13 members located a group of males congregating outside of a house of someone with whom the Sailors clique had prior altercations. J. Saenz parked the car, and the three MS-13 members—two of whom had firearms and one of whom had a machete—got out and started walking towards the house on Apple Street. The gang members attacked, firing numerous times as the group of males scattered, attempting to flee. One of the victims, John Doe #2, stumbled and fell to the ground, after which he was swarmed by the attackers, who took turns striking him repeatedly in the head, face and arms with the machete. A second victim, John Doe #1, was struck by a bullet but was able to escape and survive his injuries. Miraculously, John Doe #2 survived the attack but was severely disfigured as a result. He has undergone numerous surgeries and has suffered permanent injuries from the attack.

D. August 10, 2016 Attempted Murder of Rival Gang Members (PSR ¶ 45)

Throughout 2016, the MS-13 had a series of disputes with members of the Goon Squad, a rival gang. Several members and associates of Goon Squad lived on Lukens Avenue and the surrounding areas in Brentwood. On August 10, 2016, the defendant drove past a house on Lukens Avenue where one of the Goon Squad members lived and observed members of the rival gang outside of the house. The defendant contacted other members of the Sailors clique and directed them to go to a nearby gas station where they split into two cars and drove back to the vicinity of the rival house. The defendant was in the lookout car, while the gang members in the second car were armed with two handguns. Two MS-13 members in the second car got out, approached the house and opened fire at the people who were congregating outside. Nobody was injured during the attack, however, a stray bullet entered a neighbor's house, striking the headboard of a bed where the elderly neighbor was sleeping.

E. September 5, 2016 Murder of Marcus Bohannon (PSR ¶¶ 46-49)

On September 5, 2016, at approximately 12:45 a.m., 27 year-old Marcus Bohannon was walking alone on Lowell Avenue in Central Islip, New York, when two males, who were armed with handguns, approached Bohannon and opened fire, striking him multiple times and killing him. Members of the Suffolk County Police Department ("SCPD") responded to the scene and recovered twelve 9mm shell casings in the immediate vicinity of the body. Additionally, during the autopsy, a physician from the Suffolk County Medical Examiner's Office ("SCMEO") recovered a .45 caliber bullet and multiple 9mm bullets from Bohannon's body.

4

Subsequent investigation determined that, on the night Bohannon was killed, Torres and the defendant held a clique meeting at the defendant's house. There were nearly a dozen MS-13 members from the Sailors and Hollywood cliques at the meeting. The Hollywood clique members, whose territory included the Long Island communities of Freeport and Roosevelt, traveled to Central Islip with Torres, who lived in the Roosevelt area at the time, to participate in the meeting. Torres and the defendant led the discussion and communicated the plan to the others, including how the search for rivals would be conducted, and assigned roles. The group separated into several cars with shooters assigned for each car. The gang members then drove around the Central Islip/Brentwood area looking for rival gang members to kill.

The defendant was in a car with two other gang members, who were armed with a .45 caliber handgun and a 9mm handgun, and they stayed in communication with the other cars regarding potential targets. While driving on Lowell Avenue in Central Islip, the defendant and the other gang members observed Bohannon walking alone. Even though Bohannon was neither affiliated with a street gang nor wearing clothing or acting in any way to suggest that he was, the defendant stated that he recognized the victim as a member of the rival Bloods street gang. The defendant then communicated with his fellow gang members driving in the vicinity, informing them that they had located a rival to attack. The armed MS-13 members got out of the car, approached the victim and began shooting. They shot Bohannon multiple times, ran back to the car, and then drove to the defendant's house where they met with the other MS-13 members. Bohannon died from his wounds.

### F. September 12, 2016 Arson on Freeman Avenue (PSR ¶ 50)

During the summer of 2016, the Sailors clique had a series of disputes with a group from a neighborhood in Brentwood. On the evening of September 12, 2016, the defendant directed other Sailors clique members to set fire to a vehicle parked in the driveway of a house on Freeman Avenue in Brentwood where a member of the rival group lived. MS-13 members separated into two cars and drove to the vicinity of Freeman Avenue. The defendant was in the lookout car monitoring for police and making sure that the others successfully completed the mission. 's car acted as lookout while the other car drove to the rival member's house. The MS-13 members who drove to the house got out of the car, poured gasoline on one of the cars in the driveway and set it on fire. The first vehicle ignited with an explosive flame that quickly set fire to a second car in the driveway. Both vehicles were destroyed and the house was singed by the flames, however, the fire department arrived and extinguished the fire before it spread to the house.

### G. September 13, 2016 Murders of Kayla Cuevas and Nisa Mickens (PSR ¶¶ 51-55)

During 2016, 16-year-old Kayla Cuevas was involved in a series of disputes with members and associates of the MS-13, including disputes over social media and at Brentwood High School ("BHS"). These disputes escalated in early September 2016. On September 8, 2016, Cuevas and two friends were involved in an altercation with several MS-

5

13 members at BHS. Following the altercation, the MS-13 members vowed to seek revenge against Cuevas. As a result of that incident, Cuevas and the MS-13 members involved were suspended from BHS. In addition to the above incident, Cuevas posted at least one video on the Internet where she further disrespected the MS-13.

On the evening of September 13, 2016, at approximately 8:10 p.m., 15-year-old Nisa Mickens, who was friends with Cuevas but had no prior disputes with the MS-13, walked to a friend's house with Cuevas, where they stayed for a few minutes before leaving and walking towards Cuevas's house.

At approximately 8:36 p.m., the SCPD received a 911 call reporting that a body had been found on the side of Stahley Street adjacent to Broadway in Brentwood, which is approximately one block from Cuevas's house. When the SCPD responded to the scene, they found Mickens's body. The Medical Examiner later determined that she had sustained significant sharp force trauma to her face and blunt force trauma to her head, which fractured her skull. Later that evening, Cuevas's family reported her missing to the SCPD, who began to search for her. The following afternoon, September 14, 2016, the SCPD received a 911 call informing them that a second body had been located behind a house on a street immediately adjacent to where Mickens's body was found the previous evening. When the SCPD responded to the scene, they found Cuevas's body. As with Mickens, Cuevas had sustained significant blunt and sharp force trauma to her head and body.

Subsequent investigation determined that Cuevas and Mickens were attacked by members of the Sailors clique in retaliation for the dispute with Cuevas the previous week. More specifically, on September 13, 2016, the defendant directed members of his clique to divide into two cars and drive around Brentwood looking for rival gang members to kill. While driving, one of the cars passed Cuevas and Mickens, who were walking on the side of the road. They recognized Cuevas and called the defendant, who was in a second car and authorized them to murder Cuevas and Mickens. After receiving permission from the defendant, three MS-13 members approached the girls armed with a machete and baseball bats. They attacked Mickens first, brutally killing her and leaving her body at the side of the road. Cuevas attempted to flee but was caught a short distance away and killed. After the attack, the MS-13 members drove to the defendant's house and hid in a shed in the backyard while the defendant and other MS-13 members hid the murder weapons.

H.  October 10, 2016 Murder of Javier Castillo (PSR ¶¶ 56-58)

On October 13, 2016, 15 year-old Javier Castillo's family reported him missing to the SCPD. Subsequent investigation by the SCPD determined that Castillo was last seen alive by family members on the afternoon of October 10, 2016, and that his cell phone was last active on October 10, 2016. Castillo's brother informed the SCPD that he was told by a family member with ties to the MS-13 to stop looking for Castillo because he was "gone and buried." Thereafter, Castillo's family provided limited cooperation to the SCPD.

Subsequent investigation determined that the defendant and other MS-13 members from the Sailors clique killed Castillo because the gang suspected him of being a member of the rival 18th Street gang. The MS-13 members convinced Castillo to go with them from Brentwood to Freeport to smoke marijuana. They drove the victim to Cow Meadow Park, in Freeport, and led him to an isolated area along the water. Under the defendant's supervision, the MS-13 members attacked Castillo, striking him repeatedly with a machete. Once Castillo was dead, the gang members dug a hole and buried his body, which was not found until October 2017.

I.  October 13, 2016 Murder of Dewann Stacks (PSR at ¶ 59)

Just before midnight on October 13, 2016, the SCPD received multiple 911 calls reporting an unresponsive male lying in the street on American Boulevard in Brentwood and bleeding from the head. Responding police officers and medical technicians discovered the body of Dewann Stacks. The victim had extremely traumatic injuries to the head, face and neck, leaving him completely unrecognizable. The SCMEO determined the cause of death to be sharp force and blunt force trauma to the head.

Subsequent investigation determined that on the night of the murder Sailors clique members were driving in Brentwood when they observed Stacks and mistakenly identified him as a member of a rival gang. They contacted the defendant, who authorized the members of his clique to kill Stacks. The defendant, who was in a second car and in close proximity to the other gang members, acted as a lookout while the MS-13 members attacked Stacks. Armed with machetes and a baseball bat, the gang members swarmed Stacks, repeatedly striking him and focusing the attack at his neck and head.

J.  January 30, 2017 Murder of Esteban Alvarado-Bonilla and Shooting of Jane Doe (PSR ¶¶ 64-67)

On January 30, 2017, at approximately 10:30 a.m., a masked gunman entered El Campesino Deli (the "Deli") at 133 Caleb's Path in Central Islip, New York and fired multiple shots with a 9mm semi-automatic handgun, which struck Esteban Alvarado-Bonilla in the head and torso. One of the bullets passed through Alvarado-Bonilla's head and struck a female employee of the Deli ("Jane Doe") in the chest. When members of the SCPD responded to the Deli, they found the two victims, who were transported to Southside Hospital. Alvarado-Bonilla died from the gunshot wounds, but Jane Doe survived.

Subsequent investigation determined that Alvarado-Bonilla was killed by members and associates of the Sailors clique after the defendant saw the victim at the Deli, recognized him as a member of the rival 18th Street gang, and directed members of his clique to carry out the murder. More specifically, after seeing Alvarado-Bonilla at the Deli just before dawn on January 30, 2017, the defendant contacted J. Saenz and the two orchestrated the plan and selected the members who would participate. The defendant and his brother sent one gang member into the deli to conduct surveillance on the victim while assembling three other gang members to carry out the murder. The three used a car belonging to the clique, drove to the

vicinity of the Deli, and one of the gang members went into the Deli to confirm that Alvarado-Bonilla was still there. Thereafter, the shooter, who was carrying a 9mm handgun provided by the defendant, walked into the Deli wearing a mask and shot Alvarado-Bonilla several times before running back to the car and leaving the scene. One of the bullets passed through Alvarado-Bonilla's head and struck Jane Doe in the chest.

Alvarado-Bonilla died from his wounds. Jane Doe was transported to Southside Hospital and survived her injuries. Nearly two years after the incident, Jane Doe underwent surgery to have the bullet removed from her chest after doctors discovered that it was moving and causing her significant pain. The 9mm handgun that was used to kill Alvarado-Bonilla was recovered at the defendant's house during a search of his premises on March 2, 2017.

### K. Conspiracy to Distribute Cocaine and Marijuana (PSR ¶ 68)

From April 2016 to March 2017, the defendant obtained wholesale amounts of cocaine and marijuana, packaged the drugs for street level distribution and gave them to members of the clique to sell. The profits from the drug sales were returned to the defendant and J. Saenz who used the proceeds to send money to leaders in El Salvador, and to fund the gang's criminal activities, including the purchase of firearms and more drugs to sell.

## II. The Defendant Should Be Sentenced to 70 Years in Prison

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 70 years in prison.

### A. Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and

8

(2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

B. Analysis

Should the Court formally accept the Plea Agreement, the defendant must be sentenced within the agreed upon range of 40 to 70 years. See Plea Agreement at ¶ 3 and Rule 11(c)(1)(C). After considering the sentencing factors set forth by Congress in § 3553(a), the government respectfully submits that the defendant should be sentenced to 70 years in prison.

1. Nature and Circumstances of Offense Conduct and Defendant's Role

As the leader of the Brentwood/Central Islip Sailors clique, the defendant was the driving force behind a devastating crime wave that terrorized that community for over a year in 2016 and 2017. The frequency and brutality of the violence unleashed by the defendant's clique was unprecedented, even for the MS-13—a gang that values violence and murder above all else. Simply put, during the defendant's tenure as leader, the Sailors clique was the most violent and destructive MS-13 clique operating in the United States.

Moreover, the public displays of violence—which were not limited to murder, but also included arson, attempted murder, and assault—committed in quick succession and within a relatively small geographical area, caused panic in the communities of Brentwood and Central Islip and traumatized countless residents for years after. Furthermore, most of the victims were killed using excessive violence, which undoubtedly caused them extraordinary pain, suffering, and fear in their last moments. Michael Johnson, for example, was invited to smoke marijuana in the woods by the defendant, where he was attacked, without warning, by multiple MS-13 members wielding a baseball bat, machete and knife. Johnson's body was discovered on February 2, 2016 by two individuals walking through a narrow, wooded area separating an apartment complex from residential homes, in Brentwood. Oscar Acosta's murder was similarly horrific. He was beaten unconscious in the woods near a school by several members of the Sailors clique, then bound and gagged, put into the trunk of a car and driven to a more remote wooded area where MS-13 members hacked Acosta to death with machetes. Acosta was reported missing following his murder in Brentwood on April 29, 2016, and his body was discovered on September 16, 2016.

As vicious as the Johnson and Acosta murders were, the defendant and the Sailors clique were just getting started. On July 18, 2016, the defendant authorized the Apple Street Assault. While no one was killed in that attack, one of the victims, who fell to the ground when trying to escape, was surrounded and struck repeatedly with a machete to his

9

arms, head and face. Miraculously, the victim survived the attack but the wounds from the assault left him severely disfigured, even after numerous surgeries. Less than a month later, on August 10, 2016, the defendant ordered and supervised the shooting attack of rivals outside of a residence on Lukens Avenue in Brentwood.

Not satisfied with the unsuccessful attempts to kill rivals, the defendant ratcheted up the violence. On September 5, 2016, Marcus Bohannon was gunned down while walking on Lowell Avenue in Central Islip, after the defendant falsely claimed to other MS-13 members that he recognized the victim to be a rival gang member. On September 12, the defendant supervised the firebombing of two cars parked in the driveway of a family residence on Freeman Avenue in Brentwood. The next night, September 13, the defendant authorized the murders of Kayla Cuevas and Nisa Mickens, who were 16 years old and 15 years old, respectively. The brutal and public killing of these two innocent girls received significant media attention and put law enforcement on high alert. The press coverage of the violence plaguing the community was further amplified when law enforcement discovered Acosta's body days later on September 16. Still, the defendant was undeterred, and on October 10, he supervised the murder of 15-year-old Javier Castillo, who was driven from Brentwood to Freeport, where he was hacked to death with machetes and buried. Three nights later, and exactly one month to the day after the Mickens and Cuevas murders, the Sailors clique ambushed and killed Dewan Stacks on American Boulevard in Brentwood. Again, the gang chose to use machetes and baseball bats to kill the victim, leaving a gruesome scene in their wake. Finally, on January 30, 2017, Esteban Alvarado-Bonilla was shot in a delicatessen in broad daylight, after the defendant saw him there, alerted fellow gang members and orchestrated the plan to kill the victim. One of the bullets that passed through Alvarado-Bonilla's head hit the chest of a female employee in the deli who, thankfully, survived.

It is difficult to comprehend how one person could have participated in and been principally responsible for such carnage. As outlined above, rather than choosing to lay low and limit the risk of being implicated in their crimes, given the dramatic increase in police presence and media attention that ensued, the defendant pushed for and authorized more violence. Such behavior naturally suggests that the defendant was actually emboldened by their crimes and relished the publicity, and, but for law enforcement intervention, would have continued to order murders and terrorize Long Island communities. Indeed, the frequency of the violence peaked during a time of heightened public attention. During a 5-week period in September and October 2016, the Sailors clique committed five murders, including four victims who were attacked, without warning, while walking in the neighborhood where they lived. The defendant's deliberate decision to continue to brutally kill victims and commit other acts of violence, often just on the heels of a prior crime and in the midst of significant public attention, demonstrates a rare commitment to causing harm and a level of culpability that distinguishes this defendant from other criminals in even the most heinous cases.

Furthermore, the fact that so many of the defendant's victims were forced to endure such excruciating deaths certainly deepens the anguish felt by their loved ones who were faced, in some cases, with the horror of having to identify their family member's mutilated body, followed by a lifetime of anguish knowing the suffering they endured at the

end of their lives. In sum, the uniquely depraved nature of this conduct evidences an indifference to human suffering and lack of respect for human life that is truly shocking and warrants a 70-year sentence.

### 2. The Defendant's History and Characteristics

The defendant's history and characteristics further support a significant sentence. The defendant's lack of any criminal history prior to the instant offense is irrelevant given the scope of the conduct for which he is being sentenced. As the crimes outlined above demonstrate, the defendant was more than just a committed member and leader of the MS-13, he was a zealous follower of the gang's sadistic mission and possessed an overwhelming obsession with killing in the name of the gang. The nature and scope of the violence he committed and his desire to not just kill but to torture their victims to death, reflects a disconnect from humanity that distinguishes him from most criminals, and even most murderers.

Furthermore, and contrary to the defendant's assertion that he "has been making penance since his arrest" (Def. Mem. at 5), the defendant has consistently engaged in violative conduct since being remanded to federal custody at the Metropolitan Detention Center-Brooklyn ("MDC") and has continued to maintain a significant role in the MS-13 inside of the prison. Specifically, since being incarcerated, the defendant has been caught with a sharpened metal object, or "shank" on at least three occasions, the most recent of which was on January 27, 2022. PSR at ¶ 214. Also, on numerous occasions, he has been disciplined for assaulting other inmates and refusing to obey staff commands. Id. The defendant has twice been caught with a cell phone, and most recently, on January 27, 2022, he was in possession of two cell phones. Id. On March 7, 2023, during a search of the unit where the defendant and numerous other MS-13 members and associates are presently housed, prison officials seized a Samsung phone from one of his co-defendants. The device contains numerous "selfie" and other pictures of the defendant, which are from in or around February and March 2023, in which he is flashing MS-13 gang signs. One example is below:



In addition to the cell phone containing evidence of the defendant's use, the search team recovered a photograph, which was taken inside of the MDC, of more than a dozen known members of the Sailors clique, including the defendant. In the photograph, the defendant and other gang members are wearing rosary beads with an anchor, which are symbolic of their membership in the Sailors clique of the MS-13. A copy of the photograph is below:



Most recently, the defendant orchestrated the December 1, 2024 attempted smuggling of a large package of contraband into the MDC, which was specifically destined for the MS-13 unit (the "Attempted Smuggling"). See United States v. Ortega-Corea, No. 25-CR-83 (GRB). The package contained the following: 18 cellular telephones; approximately 345 grams of a green-

12

leafy substance believed to be marijuana; 9 boxes of Newport cigarettes; 6 packages of Bluntville rolling paper; 1 package of Bob Marley rolling paper; 2 sets of earbuds with microphone; 17 charging cables; 10 black charging blocks; and 1 water bottle containing 1 Liter of clear liquid of drinking alcohol.  A photo of the contents of the package is below:



The defendant in that case, Jairon Ortega-Corea ("Ortega-Correa"), is the defendant's cousin and, at the time of the Attempted Smuggling, was living at the same house that the defendant had lived in prior to his arrest in 2017.  Prison records reveal that Ortega-Corea visited the defendant at the MDC one week before the Attempted Smuggling and further indicate that there was an 11-minute recorded call between the two on December 13, 2024, during which it is plainly clear that they are discussing the incident.  Additionally, on December 2, 2025, authorities at MDC seized two additional cell phones from the defendant's unit, one of which revealed extensive use by the defendant, including communications with Ortega-Corea both coordinating the packages arrival, and the purchase and use of other contraband items.

   Thus, the defendant's violent, destructive and disobedient conduct, as well as his continued allegiance to the MS-13 during his incarceration, clearly demonstrates the ongoing danger that he poses to the public.  Indeed, the same pattern of violence and mayhem that has marked his life on the street has not waned with the passage of time.  Moreover, by his acts of disobedience—which facilitate communication between incarcerated MS-13 members and those who are still at liberty—the defendant continues to threaten the safety of the community.  Contrary to his arguments now, at the time of his sentencing, the defendant will be a 30-year-old man who is still firmly entrenched in the MS-13 gang.

   The defendant makes several additional arguments in support of a reduced sentence.  First, he cites his difficult upbringing in El Salvador, including physical and emotional abuse from his father until the age of 5, extreme poverty before coming to the United States at age 16, and physical abuse from his stepfather after moving in with his mother in Central Islip.  Def. Mem. at 8-11.  While the defendant's traumatic upbringing is certainly something that the Court can consider when determining a proper sentence, any mitigating

value is overwhelmingly outweighed by the offense conduct. Furthermore, the defendant's personal circumstances as a child, while tragic, certainly do not warrant the sentencing reduction he seeks. Indeed, the experiences of extreme poverty, abuse and neglect are, unfortunately, not unique to the defendant and his argument in this regard ignores the fact that the overwhelming majority of immigrants who come to this country under the same or similar circumstances, in search of a better life for themselves and their families, are honest, hardworking, law-abiding, and productive members of society who do not join violent street gangs and commit murder.

Second, the defendant asserts that leniency is warranted due to his diagnosis of intellectual disability. Def. Mem. at 11-13; Exhibit B to Def. Mem. Notwithstanding the diagnosis provided by the defendant's expert, the defendant was certainly a high functioning member of the MS-13. As leader, he took on a multitude of responsibilities while running one of the most destructive and productive (by MS-13 standards) cliques to ever operate in the United States. The defendant managed the activities of more than a dozen members of the Sailors clique. He directed their cocaine and marijuana distribution operations, ran regularly scheduled meetings where gang business was discussed and dues collected, and orchestrated approximately a dozen highly coordinated and premeditated acts of violence, resulting in eight murders, all in furtherance of the MS-13's mission. Thus, the defendant's purported intellectual disability did not interfere with his ability to lead his clique or kill with impunity, and it should be afforded minimal weight in support of a lower sentence.

Finally, the defendant claims that he was groomed by the gang and was naïve to the fact that he had, first, befriended MS-13 gang members, and later, what joining the gang meant. Def. Mem. at 16. These claims are simply not credible and wholly belied by evidence of the defendant's experience with the gang in El Salvador, his longstanding and faithful commitment to the gang after arriving in the United States, and common sense. The defendant was certainly aware of the MS-13 and what its members are capable of, having grown up in El Salvador until the age of 16. He even described how the gang "had extorted his grandmother" and that "he wanted no part" of the MS-13 in El Salvador. Id. Indeed, the violent doctrine of murder and mayhem that defines the very existence of the MS-13 is not something the gang attempts to hide–quite the contrary. The MS-13 employs such extreme, public, and brazen acts of violence not just to maximize the suffering of their victims, but also to instill fear and terror in the communities where they operate in order to assert their dominance—something that is well known to the general public here on Long Island, particularly within the El Salvadoran community. The idea that the defendant, someone who witnessed firsthand the gang's criminal activities in El Salvador and then began associating with one of the most established and powerful cliques in the MS-13 after arriving to Long Island, was somehow caught unaware by his rise up the ranks and was a reluctant participant in the gang is patently absurd. Nor can his claimed intellectual impairments be blamed for his joining the MS-13. Id. By the time the defendant had ascended to a leadership position, he had already earned the gang's trust and demonstrated his commitment to its ideology. His participation was part of his leadership role—something he fully embraced. The defendant did not push his clique to commit more acts of violence because the leaders above him expected the Sailors to kill more

14

than any other MS-13 clique. The Sailors became the most destructive clique in the MS-13 because that is what the defendant wanted them to be.

### 3. The Need for the Sentence to Reflect the Seriousness of the Offense, Afford Adequate Deterrence and Protect the Public

With respect to § 3553(a)(2)(A) and (B), for the reasons set forth above, the horrific crimes committed by the defendant must be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses. The government respectfully submits that the 45-year sentence requested by the defendant utterly fails to satisfy the statutory requirement of providing a just punishment that reflects the loss of life, the pain and suffering experienced by the victims, and the anguish of their family members. Although the MS-13 gang is responsible for more than 70 murders on Long Island in the last two decades, the violence committed by the Sailors clique is unprecedented. Given the premeditation and level of planning, substantial loss of life, vulnerability and age of many of the victims, and overall level of violence, the defendant's crimes are fundamentally different from most other MS-13 cases prosecuted in this office and require a sentence commensurate with the conduct.

Relatedly, because Long Island has been plagued by gang violence over the past two decades, and particularly violence perpetrated by members of the MS-13, the need to afford adequate deterrence to criminal conduct, pursuant to § 3553(a)(2)(B), likewise weighs in favor of a substantial sentence. A sentence of 70 years in prison would send a strong message that this conduct will not be tolerated and will have severe consequences.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

The recommendation of 70 years in prison in this case is commensurate with the defendant's role when considering the recommendations and ultimate sentences for defendants who committed at least four murders. Primarily, the scope of the defendant's crimes makes finding other similarly situated defendants a difficult task as not many defendants in this District or throughout the country are convicted of participating in eight murders. Nonetheless, a review of sentences for defendants whose criminal conduct approaches that of the defendant further supports the government's recommendation. For example, the most culpable participants in the April 11, 2017 murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos, in Central Islip, were each sentenced to 50 or more years' incarceration. See United States v. Portillo, 17-CR-366 (S-1)(JFB) (15 year old defendant who planned and orchestrated attack was sentenced to 55 years' incarceration); United States v. Martinez, 17-CR-364 (S-1)(JFB) (juvenile who played critical role in planning and participating in 4 murders sentenced to 15 years); United States v. Escobar, 21-101 (JFB) (17-year-old female MS-13 associate, who played critical role in plot but as not hands-on attacker, and who had significant mitigating evidence based on abusive upbringing and prior sexual abuse, sentenced to 50 years' incarceration); and United States v. Villalta, 16-CR-403 (S-8) (GRB) (MS-13 leader who was responsible for five murders, and who had substantial mitigating evidence, sentenced to 55 years' incarceration).

15

Significantly, unlike Portillo, Martinez, Escobar and Villalta, the defendant was the ranking leader of a clique responsible for eight murders, committed in approximately one year. The defendant was not only a participant, but he authorized and directed the participation of others. Moreover, unlike the April 11 murders, the defendant's crimes were—with the exception of the murders of Cuevas and Mickens—committed on separate occasions, demonstrating a deep commitment to violence, which was renewed in the wake of each incident. Indeed, the defendant showed no remorse, notwithstanding the opportunity to reflect on the harm caused, and instead the conduct escalated. This not only evidences the profound risk that the defendant presents to the community, but also distinguishes him from the above-referenced defendants, who are in fact less culpable. Moreover, Portillo, Martinez and Escobar were all, unlike the defendant, juveniles at the time of their crimes, and thus deserving of mitigation that is inapplicable here. Thus, as compared to the aforementioned sentences, a sentence of 70 years' incarceration for this defendant is hardly disparate, and instead appropriately proportionate to the uniquely profound level of violence.

Additionally, there have been a number of recent sentences in racketeering cases in this District involving gang members convicted of participating in far fewer murders than the defendant and who received significant sentences, further supporting the government's recommendation and also demonstrating how grossly inadequate the defendant's request of 45 years is in this case. See United States v. Hernandez, No. 16-CR-403 (S-8) (GRB) (co-defendant MS-13 member sentenced to 43 years for in connection with role in Johnson and Acosta murders, as well as attempted murder); United States v. Cruz-Mateo, No. 18-CR-139 (S-7) (LDH) (the defendant gang member was sentenced to 45 years for two murders and racketeering conspiracy where the victims were lured to remote locations and killed for being a rival or disloyal to the gang); and United States v. Corbett, No. 20-CR-213 (KAM) (the defendant, a Bloods gang member who pleaded guilty to firearms offenses in connection with one shooting murder and two attempted shooting murders, was sentenced to 45 years' imprisonment). Indeed, when considering the number of murders and the defendant's leadership role in the gang as compared to the sentences outlined above, which include 45-years imposed in cases involving two murders, a 70-year sentence is certainly an appropriate punishment for the defendant.

5. The Defendant's Time at MDC

With respect to the defendant's argument that his pre-trial incarceration during both the power loss in 2019 and the Covid pandemic warrants a sentence even lower than the agreed-upon Guidelines range, the Second Circuit recently noted, in affirming a sentence where the district court came "down from the high end to the low end [of the Guidelines range]," that it was "aware of no authority suggesting that a district court imposing a sentence is obligated to assign even [that] much weight, let alone more, to the harsh prison conditions brought on by the pandemic." United States v. Edwards, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022) (holding that a sentence at low end of Guidelines range where court considered harsh conditions of confinement during pandemic, among other mitigating factors, was not substantially unreasonable). Here, any mitigating value considered by the Court based on the defendant's conditions of confinement is far outweighed by the other § 3553(a) factors

in this case, including, without limitation, the horrific nature of the offense conduct, the need to protect the public from future crimes of the defendant, and to provide adequate punishment and deterrence for the defendant's crimes.

Furthermore, a clear message must be sent that violent, and lawless conduct in a correctional facility such as the MDC will not be tolerated. Indeed, while the defendant laments the conditions at the prison and seeks a significantly reduced sentence as a result, the defendant's own conduct at the MDC has negatively impacted the safety and security of the prison population. The challenges to maintaining security at the MDC are only compounded by the actions of inmates like the defendant. Given the defendant's conduct—most notably his possession of multiple items of contraband, including weapons and cell phones, as well his violent assaults of other inmates—his plea for leniency based on the conditions at MDC should be wholly disregarded.

### III.   Conclusion

The § 3553(a) factors overwhelmingly support a sentence of 70 years. The crimes committed by the defendant and the Sailors clique were as senseless as they were sadistic. The victims who survived the gang's violence are left with severe physical and emotional scars. The eight victims who lost their lives did nothing to deserve what the MS-13 did to them. The defendant and the others killed them in service of the gang without remorse or any regard for them as human beings. While the victims are now at peace, their families and loved ones are not. They are forced to live out the rest of their lives suffering with the anguish of their loss. A 70-year sentence will almost certainly result in the defendant living out the rest of his life in prison. That is exactly what he deserves.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/ Paul G. Scotti
Paul G. Scotti
Justina L. Geraci
Megan E. Farrell
Assistant U.S. Attorneys
(631) 715-7836/7835/7862

cc:   Counsel of record (By ECF and email)
USPO Lisa A. Langone (By email)
Clerk of the Court (GRB) (By ECF)